UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

In re ENERGY TRANSFER LP SECURITIES  :   Civil Action No. 1:22-cv-04614-AKH
LITIGATION                           :
                                     :   CLASS ACTION
—————————————————        :
                                     :
This Document Relates To:            :   AMENDED COMPLAINT FOR
                                     :   VIOLATIONS OF THE FEDERAL
        ALL ACTIONS.                 :   SECURITIES LAWS
                                     :
—————————————————— x   DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

Page

I.      INTRODUCTION AND SUMMARY OF THE FRAUD.................................................. 2

II.     JURISDICTION AND VENUE ........................................................................................ 8

III.    PARTIES ......................................................................................................................... 9

IV.     SUBSTANTIVE ALLEGATIONS ................................................................................ 11

        A.      Background .......................................................................................................... 11

                1.      The Partnership ........................................................................................ 11

                2.      The Rover Project Is Announced and the Race Begins ........................... 13

                3.      The FERC Approves the Project Subject to Environmental
                        Conditions ................................................................................................ 15

                4.      Defendants Provide to Investors the Rover Project's Cost
                        Projections ................................................................................................ 16

                5.      Construction Begins and Drilling Crews Face Delays Immediately ........ 17

                6.      Drilling Crews Use Diesel Fuel to Keep Up with Defendants'
                        Demands ................................................................................................... 18

                7.      The April 2017 Environmental Disaster ................................................... 19

                8.      Defendants Represent that the Rover Project Deadlines and Budget
                        Would Be Met Despite the April 2017 Environmental Disaster .............. 20

                9.      The FERC Initiates Its Investigation into the April 2017
                        Environmental Disaster ............................................................................ 26

                10.     The J.D. Hair Report ................................................................................ 27

        B.      Defendants' Materially False and Misleading Statements and Omissions
                Concerning the Rover Project .............................................................................. 28

                1.      August 4, 2017 Letter ............................................................................... 29

                2.      August 9, 2017 10-Q and Earnings Call .................................................. 32

                3.      November 7, 2017 10-Q and November 8, 2017 Earnings Call............... 39

                4.      February 22, 2018 Earnings Call and February 23, 2018
                        Form 10-K................................................................................................. 43

Page

|   |   |   |   |
|---|---|---|---|
| 5. | May 10, 2018 10-Q and May 10, 2018 Earnings Call | 48 |
| 6. | August 9, 2018 10-Q and Earnings Call | 50 |
| 7. | The Rover Project Construction Is Finally Complete | 52 |
| 8. | Additional Information Regarding the Financial Impact of the Rover Project Delay Is Disclosed | 53 |
| 9. | August 8, 2019 10-Q | 56 |
| 10. | Additional Details of Defendants' Wrongdoing on the Rover Project Are Finally Revealed | 58 |

V.     CLASS ACTION ALLEGATIONS ............................................................ 59

VI.    APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE ............................................................ 61

VII.   LOSS CAUSATION............................................................ 64

VIII.  NO SAFE HARBOR ............................................................ 65

IX.    CLAIMS FOR RELIEF ............................................................ 66

COUNT I ............................................................ 66

    For Violations of Section 10(b) of the Exchange Act
Against All Defendants............................................................ 66

COUNT II ............................................................ 68

    For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants............................................................ 68

PRAYER FOR RELIEF ............................................................ 69

JURY DEMAND ............................................................ 70

1.    Lead Plaintiffs New Mexico State Investment Council ("NMSIC") and Public Employees Retirement Association of New Mexico ("PERA") ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this federal class action (the "Action") against Energy Transfer LP (the "Partnership" or "Energy Transfer"), Kelcy L. Warren ("Warren"), Thomas E. Long ("Long"), Marshall S. McCrea III ("McCrea"), Bradford Dickerson Whitehurst ("Whitehurst"), John W. McReynolds ("McReynolds"), and Matthew S. Ramsey ("Ramsey") (collectively, the "Individual Defendants," and together with Energy Transfer, "Defendants").  Lead Plaintiffs' allegations are based upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation conducted by counsel, which included, without limitation, the review and analysis of: (a) public filings made by the Partnership with the United States Securities and Exchange Commission ("SEC"); (b) releases and other statements issued by Defendants; (c) securities analyst reports, securities pricing data, news articles, websites, and other publicly available information concerning Defendants and other related non-parties; and (d) public filings in *Rover Pipeline LLC, et al.*, 177 FERC ¶61,182 (2021) (attached hereto as Exhibit A and incorporated herein by reference); and *Rover Pipeline LLC, and Energy Transfer Partners, L.P.*, 174 FERC ¶61,208 (2021).  Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants.  Lead Plaintiffs believe that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.    Lead Plaintiffs bring this securities class action on behalf of all persons who purchased or otherwise acquired Energy Transfer units between August 4, 2017 and December 16, 2021, inclusive (the "Class Period"), against Energy Transfer and the Individual Defendants for

violations of §§10(b) and 20(a) of the of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

## I.    INTRODUCTION AND SUMMARY OF THE FRAUD

3.    This securities class action arises from Defendants' materially false and misleading statements and omissions to investors regarding the construction, completion timetable, and cost of the Rover Pipeline (the "Rover Project" or the "Project"). The Rover Pipeline is an approximately 720-mile-long natural gas pipeline extending from northwestern West Virginia and southwestern Pennsylvania to central Michigan. The Rover Pipeline transports natural gas from the Marcellus and Utica shale supplies, which are located in several states, including New York, through West Virginia, Pennsylvania, Ohio, and Michigan to outlets that distribute gas across the United States. The Rover Project – which ultimately cost more than $6 billion to construct – used a drilling technique called Horizontal Directional Drilling ("HDD"), which carried the risk of drilling fluid leaking into the surrounding earth and wetlands. As such, the Rover Project was subject to the authorization and oversight of the Federal Energy Regulatory Commission (the "FERC"). The FERC's approval of the Rover Project, granted on February 2, 2017, was subject to 45 environmental conditions.

4.    On February 23, 2017, the Partnership told investors that the Rover Project would be completed in two phases at a total cost of $3.8 billion. The first phase ("Phase 1") was set to be "in service" by July 2017, and the second phase ("Phase 2") was set to be "in service" by November 2017. Construction on the Project began on March 3, 2017.

5.    Two months into construction, on an earnings call held May 4, 2017, Defendants reaffirmed their previously announced construction and in service timetable. During construction of the Rover Project, defendant Long promised that, "as Rover comes to completion, [Energy Transfer's] revenues will appreciate significantly." The converse was also true: if the Rover Project

faltered and missed its deadlines, Energy Transfer stood to lose millions in revenue every day the Project was delayed, as well as incurring the cost increases associated with the missed deadlines. Thus, investors were keenly focused on the progress of construction and the cost of the Project.

6.    To assuage investors' concerns concerning potential construction delays, Defendants repeatedly assured the market that the Rover Project would be completed on time as the "construction timeframe [was] really achievable."

7.    But, unbeknownst to investors, these deadlines were unachievable. Because of this, Energy Transfer required its contractors to work at an unsafe, breakneck pace and to cut corners. Unfortunately, an unavoidable consequence of the tone Defendants set in favor of speed over regulatory compliance was a multitude of environmental disasters, the worst of which occurred on April 13, 2017 – not even a month after construction started at the site. The April 13, 2017 disaster (the "April 2017 Environmental Disaster") involved a "frac out" or "inadvertent release" of roughly two million gallons of contaminated drilling fluid which caused severe pollution near the Tuscarawas River in Stark County, Ohio. Although the April 2017 Environmental Disaster ultimately resulted in massive fines, construction delays, and increased project costs, Energy Transfer downplayed the April 2017 Environmental Disaster as "common and normal," falsely claiming that the released substance was a "non-toxic, naturally occurring bentonite clay water slurry that is safe for the environment," and that there would be no impact to either project completion, or cost, as a result of the April 2017 Environmental Disaster.

8.    Defendants' representations were false and misleading. In reality, the construction schedule Energy Transfer announced for the Rover Project could not be met while complying with the FERC's environmental requirements. Instead, Defendants knew or recklessly disregarded that their compressed construction schedule forced construction crews to abandon best practices, which

would likely result in drilling difficulties and delays.  Indeed, Defendants knew or recklessly disregarded that the compressed construction schedule greatly increased the risk of environmental disasters, which if reported and investigated, would (and did) subject Energy Transfer to fines and further delay the construction schedule, resulting in increased overall cost of completing the project. In fact, the FERC later concluded that Defendants fostered a corporate culture in which environmental compliance was "treated[,] in practice, as an afterthought," and efforts to comply were "ineffective and superficial."  In short, the FERC's investigation determined that Defendants "favored speed and construction progress over regulatory compliance."

9.     Furthermore, Defendants knew or recklessly disregarded that the April 2017 Environmental Disaster was far from commonplace.  Rather, Energy Transfer's construction crews "intentionally and routinely" added diesel fuel and other toxic or unapproved additives to the drilling mud as early as April 2, 2017 because the construction crews were experiencing drilling difficulties that caused slowdowns and delays, jeopardizing meeting the completion deadline set by Defendants.

10.     By August 9, 2017, with the July 1, 2017 in service date for Phase 1 having come and gone, Energy Transfer released its quarterly report for the third quarter of 2017.  At that time, Defendants were forced to admit that Phase 1 would not be finished until sometime later that year and "Phase 2 sometime in the first quarter" of 2018, despite their assurances to the contrary less than two months earlier.

11.     Although Defendants announced this new timeline, they continued to deceive the market by failing to disclose that even this new timeline would not, and could not, be met.  In addition, Defendants  continued to conceal the severity of the April 2017 Environmental Disaster, the FERC's investigation into it, and the impact to both the Project completion deadline Defendants repeatedly told investors would not be implicated, and the cost to finish the Project.

- 4 -

12.     Then on November 8, 2017, just three months after announcing the new construction timeline, Defendants again pushed the Rover Project deadlines back and disclosed increased capital expenditure ("CapEx") guidance for 2017, in part because of the increase in costs for the Rover Project.

13.     After learning of these troubling developments, securities analysts again expressed concern over the Rover Project delays and costs, causing the price of Energy Transfer units to drop 6.4% over two trading days, to close at $17.51 per share on November 9, 2017.

14.     Nonetheless, Defendants continued to deceive investors by exuding confidence in the newly announced timelines and cost structure.  Defendants claimed they would "resume construction on these drills in short order," and they had "more certainty in meeting our projected in-service dates."  Defendants falsely assured investors that they were "confident the entire pipeline will be in service by the end of the first quarter of 2018."

15.     Yet, once again, the promised completion date came and went.  Rather than announcing the completion of construction in early 2018, Defendants instead announced additional delays on February 22, 2018.  At that time, Defendants also announced increased 2018 CapEx guidance by $1.5 billion, in part due to the Rover Project delays and cost overruns.

16.     On this news, the price of Energy Transfer units dropped 2.0% over two trading days, to close at $16.34 per share on February 26, 2018.

17.     But Defendants still persisted in misleading the market by assuring investors that they would complete the Rover Project's Phase 2 "throughout the next few months."

18.     Even that was false, and it was not until an earnings call held on November 8, 2018 that investors learned that the Rover Project was finally complete and in service.  But investors also

learned that the completion of the Project came at a high cost.  During this call, Energy Transfer again increased its CapEx guidance for 2018 because of the Rover Project delays.

19.    As a result, the price of Energy Transfer units dropped 4.1% over two trading days, to close at $15.40 per share on November 12, 2018.

20.    However, investors still did not know just how much the Rover Project delays cost the Partnership.  On February 22, 2019, during its fourth quarter earnings call with investors (the "4Q'18 Earnings Call"), Energy Transfer announced it yet again missed CapEx guidance by hundreds of millions of dollars due to project delays.  As multiple executives admitted, "we've made mistakes."

21.    On this news, the price of Energy Transfer units dropped 4.1% over the next three trading days, to close at $14.91 per share on February 26, 2019.

22.    At the end of the day, the Rover Project cost $6.7 billion – nearly ***twice as much*** as Defendants told investors it would cost on February 23, 2017.  Defendants also misled investors by failing to provide them with material information about the FERC's investigation into the April 2017 Environmental Disaster, and how that investigation impacted the time and expense it would take to complete the Rover Project.  Instead, when Defendants discussed the FERC's investigation, the information they provided was so vague that investors could not properly assess the impact the investigation had on the construction timelines, cost to complete the Project, or the potential liability that Energy Transfer faced for the April 2017 Environmental Disaster.

23.    But investors remained in the dark concerning the gravity of the FERC's investigation into the April 2017 Environmental Disaster, and the severity of the April 2017 Environmental Disaster itself.  It was not until the August 8, 2019 filing with the SEC of its quarterly report on Form 10-Q for the second quarter ended June 30, 2019 (the "2Q'19 10-Q") that Energy Transfer

provided any information about the FERC's findings. Energy Transfer disclosed that after a two-year, non-public formal investigation, which began in mid-2017, the FERC's Enforcement Staff provided its non-public preliminary findings to Energy Transfer "regarding allegations that diesel fuel may have been included in the drilling mud at the Tuscarawas River HDD." Energy Transfer's response to the non-public findings was voracious disagreement, implying that the non-public preliminary findings found Energy Transfer to be, at least in part, at fault for the contamination of the Tuscarawas River after the April 2017 Environmental Disaster.

24.    On this news, the price of Energy Transfer units declined 4.6% over two trading days, to close at $13.38 per share on August 12, 2019.

25.    The results of the FERC's investigation remained non-public until December 16, 2021, when the FERC publicly issued an Order to Show Cause and Notice of Proposed Penalty ("FERC Order"), which required Energy Transfer to "show cause why it should not be found to have violated" the NGA, the FERC's regulations, and the FERC's Certificate Order by: (a) intentionally including diesel fuel and other toxic substances and unapproved additives in the drilling mud during HDD operations under the Tuscarawas River in Stark County, Ohio; (b) failing to adequately monitor the right-of-way at the site of the Tuscarawas River HDD operation; and (c) improperly disposing of inadvertently released drilling mud that was contaminated with diesel fuel and hydraulic oil.

26.    The FERC proposed a massive $40 million civil penalty, which was "a departure" from the FERC's Penalty Guidelines. The FERC justified the enormous fine because of aggravating factors such as the serious environmental harm caused by the violation, the "ineffective and superficial" compliance program implemented, the severe lack of self-reporting of the incident, and the "obstructionist conduct" of Energy Transfer during the investigation.

27.     On this news, the price of Energy Transfer units declined 2.8% over the course of two trading days, to close at $8.25 per share on December 20, 2021, causing investors to lose more than $730 million in shareholder wealth.

28.     As a result of Defendants' wrongful acts and omissions, Lead Plaintiffs and other Class members (defined below) have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

29.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act., 15 U.S.C. §78aa.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act, 15 U.S.C. §78aa, as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this judicial district.  Pursuant to Energy Transfer's most recent Form 10-Q, as of July 29 2022, there were 3,086,970,948 of its partnership units ("units") outstanding.   Energy Transfer units trade on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in Energy Transfer units located within the United States, some of whom undoubtedly reside in this judicial district, and many of whom are financial institutions among the individuals most harmed by Defendants' fraudulent conduct.  Additionally, several securities analysts, many of which conduct their business in this District, reported on Energy Transfer to the market.  Finally, the Rover Project was constructed to transport natural gas resources located, in part, in the State of New York.

32.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## III.    PARTIES

33.    Lead Plaintiff NMSIC is an institutional investor that manages the investments of permanent and governmental funds in New Mexico valued at over $34 billion.  As set forth in the Certification filed on August 8, 2022, ECF No. 24-2, incorporated by reference herein, NMSIC acquired Energy Transfer units during the Class Period at artificially inflated prices and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

34.    Lead Plaintiff PERA is a retirement fund for state, municipal, and county employees in New Mexico, including police, firefighters, judges, magistrates, legislators, and volunteer firefighters.  As set forth in the Certification filed on August 8, 2022, ECF No. 24-2, incorporated by reference herein, PERA acquired Energy Transfer units during the Class Period at artificially inflated prices and was damaged by the federal securities law violations and materially false and/or misleading statements and/or material omissions alleged herein.

35.    Defendant Energy Transfer is a Delaware publicly traded partnership with its principal place of business at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225, and has several subsidiaries and affiliates registered to do business in New York, including its general partner, LE GP, LLC (ID# 2720365) and Rover LLC (ID# 4881937) the Energy Transfer subsidiary at the core of the wrongdoing alleged herein.  Energy Transfer units trade on the NYSE under the ticker symbol "ET."

36.    Defendant Warren is one of the founders of the Partnership and has served as the Executive Chairman of the Board of Directors for the Partnership.  Defendant Warren signed each of Energy Transfer's annual SEC Forms 10-K filed during the Class Period.  He also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") in Energy Transfer's FY 2018 10-K and FY 2019 10-K, and Energy Transfer's 3Q'18 10-Q, 1Q'19 10-Q,

2Q'19 10-Q, 3Q'19 10-Q, 1Q'20 10-Q, 2Q'20 10-Q, and 3Q'20 10-Q. Moreover, defendant Warren regularly attended and answered analyst questions during Energy Transfer earnings calls, including the quarterly earnings call conducted from the beginning of the Class Period through the 3Q'20.

37.     Defendant Long has served as the Partnership's Co-Chief Executive Officer ("CEO") since January 2021. Previously, he served as the Partnership's Chief Financial Officer ("CFO") from 2016 through 2020. Defendant Long signed each of Energy Transfer's Forms 10-K filed during the Class Period in addition to Energy Transfer's 2Q'17 10-Q, 3Q'17 10-Q, 2Q'18 10-Q, and 3Q'18 10-Q. Defendant Long also signed SOX Certifications in each of Energy Transfer's Forms 10-K and 10-Q throughout the Class Period. Moreover, defendant Long delivered prepared remarks and answered analyst questions on behalf of Energy Transfer during every quarterly earnings call during the Class Period.

38.     Defendant McCrea has served as the Partnership's Co-CEO since January 2021 and a director since 2004. Previously, he served as President and Chief Commercial Officer of the Partnership from 2018 through 2020. Defendant McCrea signed each of Energy Transfer's Forms 10-K filed during the Class Period. Defendant McCrea also attended every quarterly earnings call during the Class Period and regularly answered analyst questions.

39.     Defendant Whitehurst has served as the Partnership's CFO since January 2021. Previously, he also served as the Partnership's Executive Vice President ("EVP") from August 2014 through 2020. Defendant Whitehurst signed the FY 2020 10-K. Defendant Whitehurst also signed SOX Certifications in the FY 2020 10-K, 1Q'21 10-Q, 2Q'21 10-Q, and 3Q'21 10-Q.

40.     Defendant McReynolds served as President of the Partnership from March 2005 to October 2018. He has also served as a director of the Partnership since August 2004. Defendant McReynolds signed each of Energy Transfer's Forms 10-K filed during the Class Period as well as

SOX Certifications in the FY 2017 10-K, 1Q'17 10-Q, 2Q'17 10-Q, 3Q'17 10-Q, 1Q'18 10-Q, and 2Q'18 10-Q. Defendant McReynolds also attended quarterly earnings calls during the Class Period including each earnings call held from the start of the Class Period through the 2Q'18 Earnings Call.

41.    Defendant Ramsey was President and Chief Operating Officer ("COO") of the Partnership from November 2015 until April 2021. He also served as the COO of Energy Transfer from October 2018 until April 2022, and as a director of the Partnership since 2012. Defendant Ramsey signed each of Energy Transfer's Forms 10-K filed during the Class Period. Defendant Ramsey attended and spoke to investors during the quarterly earnings calls during the Class Period, including each earnings call held from the start of the Class Period through the 2Q'18 Earnings Call.

42.    The Individual Defendants, because of their positions with Energy Transfer, made and/or controlled the contents of the Partnership's public statements during the Class Period. The Individual Defendants were provided with copies of the Partnership's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to their positions with Energy Transfer, and their access to non-public, material information, the Individual Defendants knew, or were reckless in not knowing, that the adverse facts described herein were misrepresented, not disclosed to, and/or were concealed from investors. Defendants are liable for the false statements and omissions alleged herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

#### 1.    The Partnership

43.    Energy Transfer was founded in 1996 and became a publicly traded partnership in 2006. The Partnership was formerly known as Energy Transfer Equity, L.P. and changed its name to Energy Transfer LP in October 2018. Energy Transfer is engaged in natural gas and propane

pipeline transport.  The Partnership, through its subsidiaries, provides transportation, storage, and terminalling services for products such as natural gas, crude oil, Natural Gas Liquids ("NGLs"), and refined products.

44.     Energy Transfer provides energy-related services in the United States and China.  The Partnership owns and operates approximately 11,600 miles of intrastate natural gas transportation pipelines and five natural gas storage facilities.   It also owns and operates approximately 26,900 miles of interstate natural gas pipelines.  The Partnership sells natural gas to electric utilities, independent power plants, local distribution companies, industrial end-users, and other marketing companies.   The Partnership owns and operates approximately 162 miles of refined products pipelines in New York.  The Partnership also owns approximately 5,215 miles of NGL pipelines; NGL and propane fractionation facilities; NGL storage facilities with working storage capacity of approximately 50 million barrels; and other NGL storage assets and terminals with an aggregate storage capacity of approximately 17 million barrels.

45.     Rover Pipeline, LLC ("Rover") is a subsidiary of Energy Transfer.  Through Rover, Energy Transfer hired contractors to construct the Rover Pipeline.  Additionally, approximately 25-50 Energy Transfer employees worked for Rover during the construction of the Rover Project.[1] These employees included Chris Boyd, the Chief Inspector for HDD activities on the Rover Project, Yousif "Joey" Mahmoud ("Mahmoud"), Energy Transfer and Rover's EVP of Engineering and Construction, Dutch Schuman, Energy Transfer and Rover's Senior Director of Operations, William Barth, Energy Transfer and Rover's Senior Supervisor of Emergency Response, and Blair Lichtenwalter, a senior director at Energy Transfer, who received correspondence from the FERC regarding the Rover Project.

---

[1]     *Rover Pipeline*, 174 FERC ¶61,208 at 81 n.356.

2.    **The Rover Project Is Announced and the Race Begins**

46.    On February 20, 2015, Energy Transfer filed its application with the FERC detailing and requesting approval of the Rover Project.  In its application, Energy Transfer stated it expected to spend $4.22 billion on the Project.

47.    In August 2015, Energy Transfer announced that the FERC's authorization of the Rover Project was expected in the first quarter of 2016.  Defendants represented that the first phase of the Project ("Phase 1") would be fully constructed and "in service" "by the end of 2016," the second phase of the Project ("Phase 2") would be "in service" by "mid-2017," and the entire Project would cost $3.8 billion.

48.    Energy Transfer reaffirmed its construction timeline on each of its quarterly earnings conference calls from the third quarter of 2015 through the third quarter of 2016.  For example, during the second quarter 2016 earnings call held with investors on August 4, 2016 (the "2Q'16 Earnings Call"), defendant McCrea stated that analysts "can handicap [odds] at 100% that we'll have this pipeline built.  And at this point in time we expect it to be built on time."

49.    Then on November 9, 2016, during the third quarter 2016 earnings call with analysts (the "3Q'16 Earnings Call"), defendant Long reaffirmed that Energy Transfer "expect[ed] to receive the FERC Certificate any day now," and confirmed that Phase 1 would be in service "by the end of June 2017," with Phase 2 being in service "by November of 2017."  In response to analyst questions, defendant McCrea assured investors that the "construction timeframe [was] really achievable."

50.    In anticipation of the FERC's approval, in November 2016, Rover executed a $1.5 billion "time is of the essence" contract with Precision Pipeline LLC ("Precision"), a drilling company, which was the largest contractor on the Rover Project and was responsible for installing much of the pipeline by open trench installation and through HDD.  Ex. A, Appendix A at 10. Rover's contract with Precision included construction deadlines of June 16, 2017 and November 1,

2017 for Phase 1 and Phase 2, respectively, "'with time being of the essence at all times.'" *Id.* at 11.
The contract further specified daily construction progression rates, down to the foot, which were
connected to non-public, target price incentives. *Id.* at 11. Finally, the contract provided for "'no
additional time . . . for any slippage'" from the stated deadlines, unless Rover conceded the delays
were necessary in writing. *Id.* at 11. Precision in turn contracted with Pretec Directional Drilling,
LLC ("Pretec"), an HDD company that shared the same parent company with Precision, to perform
work as a subcontractor on the Project. *Id.*

51.    To build the pipeline, Energy Transfer utilized a drilling technique called HDD,
which is a trenchless drilling technique frequently used by natural gas pipelines to drill beneath
obstacles, like rivers, roads, or railways, and thereafter pull the pipe through the hole. To help the
drill bit cut through soil and rock, drilling fluid is pumped through the drill pipe string. Ex. A,
Appendix A at 6-7. The drilling fluid lubricates and cools the drill bit, and carries soil and rock
cuttings back out of the hole. Normally, the drilling fluid makes its way back to containment pits at
the entry or exit points, where it passes through a cleaning system to remove cuttings before being
recirculated back into the hole. In some instances, drilling fluid can escape the HDD hole and leak
into the surrounding earth. In extreme cases, drilling fluid can emerge at the ground surface or in
other undesired locations such as wetlands or water bodies, which is known as a "frac out" or an
"inadvertent release." *Id*.

52.    In order to succeed with trenchless drilling, drills rely on a constant circulation of
mud through the drill to the bit and back out of the hole to lubricate the drill bit and allow forward
progress. "Losing returns" happens when mud that is pumped down into the hole does not "return"
or circulate back out and is thus "lost" down the hole. *Id.* at 17 n.79. In those situations, new
drilling mud has to be mixed continuously via a mud system onsite, and then pumped into the hole,

instead of being automatically recirculated. Put differently, when there are returns of drilling mud, the mud system runs itself. But, when returns are lost, mixing and replacing the mud is a time-consuming and labor-intensive process. Drilling often has to shut down and, in order to replace the mud or clay, workers have to frequently cut and mix 50-pound bags of clay with water. *Id.* at 18. Thus, when "losing returns" and under heavy pressure to keep up with a tight construction schedule, HDD crews may resort to lubricating the drill with unapproved, and often toxic, additives such as diesel fuel. In such instances, when an inadvertent release subsequently occurs, these toxic additives leak into the nearby environment along with the drilling fluid, causing wide-scale contamination. This is exactly what happened on the Rover Project.

### 3. The FERC Approves the Project Subject to Environmental Conditions

53.    To protect against potential environmental contamination, the FERC issued a certificate order on February 2, 2017, granting approval of the Rover Project, but conditioned on 45 environmental conditions. *Rover Pipeline LLC*, 158 FERC ¶61,109 (2017) (the "FERC's Certificate Order"). Condition number one, for example, required Rover to follow the many construction procedures and mitigation measures laid out in its application and as identified in the Office of Energy Project's Environmental Impact Statement.[2] This condition required Rover to exclusively use a non-toxic, non-hazardous drilling mud in the HDD process.[3] Condition number three required Rover to ensure that all contractor personnel were informed of the role and authority of Environmental Inspectors ("EIs") on site and be trained on implementing environmental mitigation measures before becoming involved in construction activities. Additionally, condition number seven required Rover to employ at least one EI per shift with various requirements,

---

[2]     *Id.* at 1.

[3]     *Id.* at 111.

including monitoring and ensuring compliance with required environmental measures, documenting compliance, and maintaining status reports.[4]

54.    The next day, Rover filed an Affirmative Statement accepting the terms of the FERC's Certificate Order and verified Rover's current or impending compliance with all 45 of the FERC's environmental conditions.  Additionally, the FERC's Certificate Order, affirmed by Rover and Energy Transfer, stated Rover's estimate of "the total cost of the proposed facilities to be $4.082 billion."

### 4.    Defendants Provide to Investors the Rover Project's Cost Projections

55.    On February 23, 2017, Energy Transfer held a conference call with analysts and investors to discuss the Partnership's fourth quarter and year-end 2016 results and its prospects for the future (the "4Q'16 Earnings Call").  When discussing the Rover Project during the 4Q'16 Earnings Call, defendant Long announced that Energy Transfer "expect[ed] to begin construction according to the plan no later than March 1."  Defendant Long confirmed that the July and November 2017 "in service" deadlines for Phase 1 and Phase 2 of the Rover Project, respectively, had not been extended.

56.    During the same earnings call, analysts questioned the "quick in-service date" set by Energy Transfer.  But defendant McCrea quelled the concerns and confirmed that both Energy Transfer and their construction crews were "ready to go" and that even though the schedule would "be a challenge," Energy Transfer was confident that they would "be in and flowing gas to Defiance [Ohio] by July of 2017."

57.    Analysts also questioned the Project's cost.  One analyst asked, "coming back to Rover, you've got I think the CapEx is $3.8 billion, but you filed for $4 billion with the FERC.  I

---

[4]    *Id.* at 113-14.

just wanted to check your confidence that you will actually hit those numbers." Defendant McCrea replied: "Yes, I will start out. This is Mackie. Yes . . .," confirming the $3.8 billion guidance. "That's great . . ." replied the analyst.

58.     The next day, Energy Transfer filed with the SEC its annual report on Form 10-K for the period ended December 31, 2016 (the "FY 2016 10-K"). In the FY 2016 10-K, Defendants stated they expected Energy Transfer's 2017 growth CapEx to be between $3.355 billion and $3.515 billion. At this time, Defendants still maintained that the Rover Project would be completed during 2017. Thus, this figure included all of the total costs to be incurred in connection with the Rover Project.

59.     On March 3, 2017, the FERC issued a notice to proceed with construction for the Rover Project. But, from the very first day of construction, Energy Transfer was out of compliance with the FERC's Certificate Order. For example, on March 17, 2017, Rover admitted that although it was required to train all of its 15,000 personnel on environmental and safety compliance, just 4,103 employees had received the required training. Additionally, Energy Transfer, through Rover, failed to define the roles and responsibilities of its inspectors as mandated by the FERC's Certificate Order. Ex. A, Appendix A at 36. Thus, once on the site, those inspectors "lacked a meaningful presence." *Id.* at 36.

### 5.     Construction Begins and Drilling Crews Face Delays Immediately

60.     Despite being in violation of the FERC's Certificate Order, Pretec's HDD crews started drilling at the site near the Tuscarawas River on March 18, 2017. *Id.* at 15. That same day, the crews were already losing returns of drilling mud. *Id.* at 17.

61.     Although investors had no way to know this was occurring, it should have come as no surprise to Defendants. From the start of construction, Energy Transfer maintained a "corporate culture – one that equally infected the executives managing the Tuscarawas River HDD and the

- 17 -

onsite HDD crew – that favored speed and construction progress over regulatory compliance." *Id.* at 5.  For example, Mahmoud, Rover and Energy Transfer's EVP of Engineering and Construction, "continually applied direct pressure on the VP of its prime contractor, Bobby Poteete ("Poteete"), to speed up construction, which funneled down to [Pretec] and HDD crews onsite." *Id.* at 5, 37.  This resulted in Poteete emailing Pretec's General Manager, Bill Colson ("Colson"), on the first day of drilling at the site near the Tuscarawas River expressing fear that Mahmoud would react negatively to the delays in drilling.  Poteete told Colson: "[Mahmoud] will blow a gasket at some point.  That's him . . . ." *Id.* at 16.  That same day, the pressure flowed down to HDD crew members on site as Colson texted his superintendent, "[g]iddy Up, let's go" and "[d]rill, buddy, drill!!!!" *Id.*

**6.    Drilling Crews Use Diesel Fuel to Keep Up with Defendants' Demands**

62.    Desperate to "keep up with progress demands" and to "speed up [the] drilling progress" and under heavy pressure from Energy Transfer's management, from April 2 through April 13, 2017, approximately 11 HDD crew members "intentionally and routinely" added toxic diesel fuel, hydraulic oil, contaminated containment fluids, and unapproved lubricants to the drilling mud at the drilling site near the Tuscarawas River.  *Id.* at 2-3.

63.    Rover's HDD crew members later testified before the FERC that adding diesel and other unapproved additives was commonplace, discussed freely around the site, and even ordered by both foremen managing construction:

- A Night Crew Mud Technician testified that he and others were told to add diesel fuel to the drilling mud by the Night Crew Foreman on several occasions.

- A Day Crew Vacuum Truck Driver testified that he heard discussion of the Day Crew Foreman ordering crew members to add diesel fuel to the drilling mud.

- A Night Crew Driller testified that he overheard the Day and Night Utility Inspectors openly discussing adding diesel fuel on the job site.

- At least two different witnesses – one Day Crew Laborer and one Night Crew Operator – testified to hearing and receiving orders over the radio to add "ruby red" to drilling mud.

- One Night Crew Operator testified that he was ordered by the Night Crew Foreman to add hydraulic oil to the drilling mud, quoting the Night Crew Foreman as saying: "It won't hurt anything. It's probably the easiest way to get rid of it." The Night Crew Operator further testified to adding the various liquid contents of different containments into the drilling mud, which would include runoff water along with "fuel or oil off the can, or maybe the light plant leaked . . . any kind of grease or anything."

- Rover's Day Utility Inspector testified that he was "pretty much the only one" on his shift in charge of monitoring the right of way where the April 2017 Environmental Disaster occurred. He admitted that he had not been monitoring the right-of-way the week of the April 2017 Environmental Disaster, and said that if someone had been monitoring that right-of-way, the April 2017 Environmental Disaster "would have never happened." And even if it had happened, the Day Utility Inspector admitted, "if I had put the waders on a week before, you know, maybe it wouldn't have been so bad."

*Id.* at 20-27.

64. The Day Utility Inspector was not the only one to fail to "put the waders on." In fact, the April 2017 Environmental Disaster likely went on for three to four days – or roughly seven shifts – before it was even discovered. *Id.* at 35.

### 7.    The April 2017 Environmental Disaster

65. On April 13, 2017, the worst of the various environmental disasters caused by the Rover Project was discovered. The April 2017 Environmental Disaster was caused by the "inadvertent release" of nearly two million gallons of contaminated drilling fluids, which was discovered on the west side of the Tuscarawas River. *Id.* at 26.

66. On April 14, 2017, the Ohio Environmental Protection Agency ("Ohio EPA") issued a violation notice to Rover stemming from the April 2017 Environmental Disaster. At that time, the Ohio EPA was unaware that Rover drilling crews "intentionally and routinely" added toxic diesel fuel and other unapproved additives to the drilling mud.

67.     Instead of admitting to the violations when the news of the April 2017 Environmental Disaster broke, Alexis Daniel, a spokesperson for Energy Transfer/Rover, consistently told the media and the market that "[t]he drilling mud that was released is made up of natural clay and water and is ***nontoxic and it is not harmful to the environment***."

68.     Further concealing the severity of the April 2017 Environmental Disaster, Energy Transfer, through Rover, referred to it in its public weekly status report filed with the FERC, dated April 27, 2017, as "a ***common and normal*** component of executing directional drilling operations" which occurred "[d]ue to the subsurface conditions and other environmental conditions of the locations." In the same report, Energy Transfer also asserted that the drilling fluid "is a ***non-toxic, naturally occurring bentonite clay water slurry that is safe for the environment***."

69.     Additionally, by May 2, 2017, only 9,369 of Rover's over 15,000 personnel were trained on environmental and safety compliance. This meant that the Partnership was ***still*** non-compliant with the FERC's Certificate Order.

### 8.     Defendants Represent that the Rover Project Deadlines and Budget Would Be Met Despite the April 2017 Environmental Disaster

70.     On May 4, 2017, Energy Transfer filed with the SEC its Form 10-Q for the first quarter of 2017 (the "1Q'17 10-Q"). The 1Q'17 10-Q was signed by defendant Long, with SOX Certifications signed by defendants Long and McReynolds. In that filing, Energy Transfer made no mention whatsoever of the April 2017 Environmental Disaster or the April 14, 2017 letter it received from the Ohio EPA notifying it of violations relating thereto. Nor did Energy Transfer discuss even the possibility that liability might arise from the toxic drilling mud used in connection with the April 2017 Environmental Disaster. Instead, Energy Transfer stated, "we believe our operations are in substantial compliance with applicable environmental laws and regulations."

71.     The same day, Energy Transfer held an earnings call with analysts and investors to discuss the Partnership's first quarter 2017 results (the "1Q'17 Earnings Call").  Prior to the 1Q'17 Earnings Call, analysts, unaware of the severity of the April 2017 Environmental Disaster, were focused on the construction timelines and in service deadlines for the Rover Project.

72.     For example, an analyst report from BMO dated April 19, 2017 commented that "investors will be focused on . . . timing updates to the start-up of Rover along with color on the pursuit of alternate financing."  Wells Fargo added that Energy Transfer "should benefit from a number of potential catalysts this year including: (1) the start-up of major growth projects [including] Rover later this year."  On May 2, 2017, an analyst from JP Morgan identified "project execution risk" for Rover as one of the "[r]isks to ETP."  In anticipation of the earnings call, on May 3, 2017, an analyst from Jeffries stated: "We hope to hear . . . updates on planned growth initiatives [like] Rover."  BMO also listed "[u]pdates on Rover phase I & II timing" as a "key point."

73.     However, prior to the 1Q'17 Earnings Call, several key events made meeting Energy Transfer's already "aggressive" timeline increasingly improbable.  First, in order to install the 500 miles of pipe over the 120-day timeframe it told the market it would take to complete Phase 1 construction, Energy Transfer had to lay 125 miles of pipe per month – more than twice its initial timeline of roughly 50 miles per month.  This pace assumed zero stoppages or slow-downs, and required Rover crews to lay a foot of pipe every 3.9 seconds, around the clock, 7 days a week.  But, on March 18, the first day of drilling at the Tuscarawas River site, Rover crews were already experiencing lost returns, which slowed progress, caused delays, and resulted in stoppages. Ex. A, Appendix A at 17.  For example, on March 23, 2017, only five days into drilling, HDD activities at the Tuscarawas River site had to be stopped because a potential inadvertent release was discovered. *Id.* at 19.  Returns were lost repeatedly throughout the 27 days of drilling at the Tuscarawas River

site until the April 2017 Environmental Disaster was discovered, slowing and eventually stopping progress. *Id.* at 17-18.

74.    Still, Defendants did not adjust their previously announced construction deadline.

75.    On the contrary, defendant Long assured investors during the 1Q'17 Earnings Call on May 4, 2017 that Energy Transfer's construction and engineering groups "remain[ed] very focused on *safely and responsibly* bringing other projects, including . . . Rover . . . into service *according to their current schedules*."

76.    Even when specifically questioned by analysts on the 1Q'17 Earnings Call about Energy Transfer's tight construction timelines, defendant McCrea again represented that Energy Transfer had not "changed that for a long period of time.  Our estimated time, *we still are saying July 1, 2017.  In several months, we'll bring on Phase I to Defiance [Ohio], and then *we'll complete the project in November of 2017*."  Defendant Long also stated that the Rover Project "*remain[ed] on schedule*."

77.    Defendants' representations had the desired results; analysts believed that all was well with the Project and that Phase 1 and Phase 2 of the Rover Project were moving along as planned and were not experiencing any construction difficulties.  Accordingly, Morgan Stanley reported on May 4, 2017: "Large projects remain on track" and "its in-service targets of service to Defiance in July and Dawn in November remain on track."  The next day, Wells Fargo concurred stating: "Rover is on track to be in service to the Midwest in July and to Dawn by November."  Credit Suisse had the same message on May 9, 2018.  The media also reported that "[a]fter a pair of wetlands spills in April, *Energy Transfer* still planned to finish the *Rover* project and begin operating the pipeline this year."

- 22 -

78.     On May 10, 2017, the FERC's Office of Energy Projects ("OEP") issued a letter to Rover, halting the HDD activities for the Project.  The same day, Energy Transfer's spokesperson represented publicly: "We are ***not out of compliance with any of our permits***."  The *Sentinel-Tribune* also reported that Energy Transfer's spokesperson "stated the 'drilling mud' inadvertently released in several incidents is ***safe for the environment***."

79.     The next day, Alexis Daniels, an Energy Transfer spokesperson told *The Times Reporter* that "'[a]t this time, there has been ***no change to our construction schedule***.'"

80.     On May 12, 2017, the Ohio EPA informed Rover that hotline tips suggested diesel fuel might be present in the drilling mud.  Ex. A, Appendix A at 27.

81.     On May 26, 2017, the Ohio EPA informed Energy Transfer and the FERC that testing of drilling fluid near the site of the April 2017 Environmental Disaster revealed the presence of petroleum hydrocarbon constitutes, commonly found in diesel fuel.  *Id.*

82.     A few days later, from May 31 through June 1, 2017, Energy Transfer attended and presented at the MLPA Investors Conference.  During Energy Transfer's presentation at that conference, Energy Transfer continued to represent that Phase 1 would be in service in July 2017 and Phase 2 would be in service in November 2017.  As set forth below, none of Energy Transfer's presentation slides mentioned that the FERC halted HDD activities on May 10, 2017 or that Ohio EPA testing specifically advised Energy Transfer that diesel fuel was likely present in the drilling fluid at the April 2017 Environmental Disaster site.  Rather, those slides repeatedly reaffirmed the July 2017 and November 2017 completion dates for Phases 1 and 2 of the Rover Project, respectively.



## ADDITIONAL HIGHLIGHTS

➢ Pro Forma Q1 2017
  • Adjusted EBITDA (consolidated): $1.414 billion
  • Distributable Cash Flow attributable to the partners of ETP: $900 million
  • Distribution per ETP common unit paid May 15, 2017: $0.535 for Q1 2017 ($2.14 per ETP common unit annualized)
  • Distribution coverage ratio: 1.13x

➢ In Q1 2017, ETP and SXL collectively raised more than $5 billion in cash from the Bakken equity and debt financings, and equity and senior note issuances

➢ As of March 31, 2017, the combined partnerships had borrowing capacity of up to $6.25 billion under respective long-term credit facilities, with the total liquidity available of approximately $5 billion

➢ Strong distributable cash flow expected from growth projects coming online in 2017
  • Comanche Trail and Trans-Pecos pipelines went into service Q1 2017
  • Panther processing plant, which is in the Midland Basin, came online January 2017
  • Bakken Pipeline (Dakota Access and ETCO) service expected to begin June 1, 2017
  • Rover expected be in service for Phase 1 (July 2017) and Phase II (November 2017)
  • Mariner East 2 expected to be in service by the end of Q3 2017
  • Arrowhead processing plant expected to come online Q3 2017
  • Revolution Project expected to be in service Q4 2017
  • Bayou Bridge segment from Lake Charles to St. James expected to be completed Q4 2017

➢ Growth Projects Recently Announced
  • Rebel II Processing Plant in West Texas expected to go into service in Q2 2018
  • Long-term, fee-based gathering and processing agreement with Enable to begin utilizing idle pipeline and processing capacity in North Texas
  • Frac V at Mont Belvieu, Texas expected to be in service Q3 2018
  • Permian Express 3 currently in open season

5

## MARCELLUS/UTICA ROVER PIPELINE

### Project Details

- Sourcing natural gas from the Marcellus and Utica shales
- Connectivity to numerous markets in the U.S. and Canada
  - Midwest: Panhandle Eastern and ANR Pipeline near Defiance, Ohio
  - Michigan: MichCon, Consumers
  - Trunkline Zone 1A (via PEPL/Trunkline)
  - Canada: Union Gas Dawn Hub in Ontario, Canada ("Dawn")
- 712 miles of new pipeline with capacity of 3.25 Bcf/d
- 3.1 Bcf/d contracted under long-term, fee-based agreements
- 65% owned by ETP / 35% owned by Traverse Midstream Partners LLC

### Rover Project Map

### Timeline

- Completed tree clearing by March 31, 2017 deadline
- Expected in-service: July 2017 to Defiance, Ohio, and November 2017 to Dawn

21

## FORESEE SIGNIFICANT EBITDA GROWTH IN 2017 AND 2018 FROM COMPLETION OF PROJECT BACKLOG

| | Project Description | Project Timing |
|---|---|---|
| Panther Processing Plant | 200 MMcf/d cryogenic processing plant in Midland Basin | In Service Jan. 2017 |
| Trans-Pecos and Comanche Trail Pipelines[(1)] | Collective 337 miles of natural gas pipelines with 2.5 Bcf/d capacity in the Permian | In Service Q1 2017 |
| Bakken Crude Pipeline[(2)] | 30" pipeline from North Dakota to Patoka Hub, interconnection with ETCO to reach Nederland | June 2017 |
| Rover Pipeline[(3)] | 712 mile pipeline from Ohio / West Virginia border to Defiance, OH and Dawn, ON | July/Nov. 2017 |
| Arrowhead Processing Plant | 200 MMcf/d cryogenic processing plant in Midland Basin | Q3 2017 |
| Mariner East 2 | NGLs from Ohio/PA Marcellus Shale to the Marcus Hook Industrial Complex with 275Mbpd initial capacity; 450Mbpd total capacity w/storage | End of Q3 2017 |
| Revolution System | 110 miles of gas gathering pipeline, cryogenic processing plant, NGL pipelines, and fractionation facility in PA | Q4 2017 |
| Bayou Bridge[(4)] | Crude pipeline connecting Nederland to Lake Charles / St. James, LA | Q2 2016; Q4 2017 |
| Permian Express 3 | Ability to provide Permian takeaway capacity of up to 300Mbpd, with first phase targeted at 100Mbpd | Phase I Q4 2017; Phase II 2018 |
| Rebel II Processing Plant | 200 MMcf/d cryogenic processing plant near existing Rebel plant | Q2 2018 |
| Lone Star Frac V | Additional 120 Mbpd fractionator at Mont Belvieu complex | Q3 2018 |
| Mariner East 2X | Increase NGL takeaway from the Marcellus to the East Coast w/storage at Marcus Hook Industrial Complex; 250Mbpd total capacity | In Open Season |

(1) JV with Carso Energy and Mastec, Inc; ETP – 16%, Mastec – 33%, Carso – 51%
(2) JV with P66; and MarEn ETP 38.25%; MarEn, 36.75%; and Phillips 66, 25%
(3) JV with Traverse Midstream (Formerly AE-Midco), 65% ETP ownership; 35% Traverse
(4) JV with Phillips 66 Partners; 60% ETP ownership/operator; 40% Phillips 66 Partnesr

25

9.    **The FERC Initiates Its Investigation into the April 2017 Environmental Disaster**

83.    On June 1, 2017, OEP sent a letter to Rover confirming that the Ohio EPA had notified the FERC of the presence of petroleum hydrocarbon constitutes, commonly found in diesel fuel, in samples of drilling fluid near the site of the April 2017 Environmental Disaster. The June 1, 2017 letter also informed Energy Transfer, through Rover, that the FERC's Enforcement Staff decided to immediately initiate an investigation to determine the underlying facts that led to the presence of petroleum hydrocarbons in the drilling fluid. On that same day, the FERC privately issued its first data requests to Defendants seeking information concerning the April 2017 Environmental Disaster. The next day, the FERC requested witness testimony from Rover and Energy Transfer employees regarding the same subject.

84.    Energy Transfer provided no update to investors. As a result, based on Defendants' false and misleading statements, analysts continued to believe and report to the market that the Rover Project was on track. For example, on June 6, 2017, an analyst from Evercore reported: "Following meetings with ETP management at MLPA, we expect Rover will begin partial service of Phase I in July. Full service of Phase I is expected by the end of July."

85.    Meanwhile, Energy Transfer was actively impeding the FERC's investigation into the April 2017 Environmental Disaster. Among other things, Energy Transfer failed to promptly provide the requested documents and witness testimony, further delaying any resolution by the FERC. Indeed, Defendants did not complete their document production until May 21, 2018 – two subpoenas and nearly a year after the FERC first made the requests.

86.    And Rover's stonewalling of the FERC's requested witness testimony went so far as to outright deny access to key witnesses, purportedly because it did not want to "disrupt or negatively impact Rover's ongoing activities." In response, on July 12, 2017, the FERC's OEP sent

Rover a letter that expressed "concern[] that the lack of availability of Rover's personnel and its contractors' personnel is delaying our ability to determine the relevant facts."  Rover did not even produce its first witness until August 18, 2017 and that individual was the one deemed "least relevant."

87.    On July 17, 2017, another environmental agency – the West Virginia Department of Environmental Protection ("WVDEP") – issued a cease and desist order to Rover, halting drilling on the Rover Project in West Virginia.

### 10.    The J.D. Hair Report

88.    To aid in its investigation, the FERC enlisted the assistance of third-party consultant J.D. Hair & Associates, Inc. ("J.D. Hair").

89.    On July 31, 2017, J.D. Hair published a report (the "J.D. Hair Report") with its conclusions regarding the April 2017 Environmental Disaster.  Ex. A, Appendix A at 29.  The J.D. Hair Report revealed, among other things, that: (a) Energy Transfer's contractors' course of conduct was partially to blame for the April 2017 Environmental Disaster; (b) the April 2017 Environmental Disaster likely occurred for three to four days prior to being discovered by Energy Transfer; (c) Rover's documentation of HDD activities was "very limited"; and (d) based upon the documentary evidence available, Rover's activities fell below HDD industry practices.  *Id.*  Regarding the last point, the J.D. Hair Report specifically stated that:

> PDD [Pretec Directional Drilling, LLC] did not provide documentation in their daily reports as to any other drilling practices, such as adjusting drilling fluid properties, or mixing a thick bentonite plug in an attempt to seal the formation.  In addition, they did not document procedures or measures for minimizing the risk of an IR [Inadvertent Release] while continuing without drilling fluid circulation.  Due to lack of operational details and commentary in PDD's reports, it is not possible for JDH&A to provide a firm opinion with respect to whether or not PDD's operational measures to restore circulation or their drilling procedure to minimize the risk of IR's met HDD industry standards.  ***If PDD performed no other measures than what is indicated in their reports, then it is the opinion of JDH&A that they did fall short***

*of common HDD industry practices used to restore drilling fluid circulation* as
outlined in Drilling Fluids in Pipeline Installation by Horizontal Directional Drilling.

**B.    Defendants' Materially False and Misleading Statements and
Omissions Concerning the Rover Project**

90.    Throughout the Class Period, Defendants concealed and misrepresented that:
(a) Energy Transfer, through its subsidiary Rover, set unrealistic timelines for construction of the
Rover Project; (b) the unrealistic construction timelines forced Energy Transfer's third-party
contractor to cut corners, add illegal additives in the drilling mud used for HDD, resulting in the
April 2017 Environmental Disaster, which caused severe pollution near the Tuscarawas River;
(c) Energy Transfer had inadequate internal controls and procedures to prevent contractors from
engaging in illegal conduct with regards to drilling activities, and/or failed to properly mitigate
known issues related to such controls and procedures; (d) Energy Transfer continually downplayed
the FERC's active investigation and its impact on the stated construction deadlines and Project cost;
(e) Energy Transfer would be subject to enormous civil liabilities from the April 2017
Environmental Disaster; (f) Energy Transfer's thwarting of the FERC's investigation into the April
2017 Environmental Disaster compromised the Partnership's ability to meet the stated deadlines for
completion of the Rover Project; and (g) as a result of the foregoing, the cost of the Rover Project
would greatly exceed the costs previously represented to investors.  These issues were foreseeably
likely to subject Energy Transfer to increased governmental scrutiny and enforcement, as well as
increased reputational and financial harm, and would materially impact Energy Transfer's financial
results by delaying the completion of the Rover Project thereby increasing the cost to construct,
remediate, and complete the Project in accord with the FERC's requirements.  These omissions and
misrepresentations caused Energy Transfer's units to trade at artificially inflated prices throughout
the Class Period.

### 1.    August 4, 2017 Letter

91.    On August 4, 2017, Defendants chose to respond to the J.D. Hair Report in a public letter (the "August 4, 2017 Letter").  Defendants falsely and categorically rejected any inference that the presence of diesel could be attributed to Energy Transfer, even claiming that the presence of diesel may have been entirely unrelated to the Rover Project construction.  Defendants' August 4, 2017 Letter stated in relevant part:

> Rover theorizes that these diesel concentrations could have been caused by an inadvertent and unreported spill or leak *from equipment operating during the clean-up of the IR*, or it could have been the *deliberate or malicious act of individuals opposed to the project*.  Given the extensive inspection and oversite at this and other sites along the project, *it is difficult to imagine that this occurred from an unreported spill or leak*.

92.    The statements in ¶91 were materially false and misleading or omitted facts necessary to make them not misleading when made, for the reasons stated herein, including:

(a)    That Defendants fostered a corporate culture in which environmental compliance was "treated[,] in practice, as an afterthought," and efforts to comply were "ineffective and superficial."  Ex. A, Appendix A at 36.  Indeed, Defendants failed to define the roles and responsibilities of its inspectors to be in compliance with the FERC's Certificate Order.  *Id.*  Once on site at the Rover Project, those inspectors "lacked a meaningful presence."  *Id.*  In short, Defendants "favored speed and construction progress over regulatory compliance."  *Id.* at 42.  This corporate culture inevitably caused environmental disasters, like the April 2017 Environmental Disaster, which both delayed construction and increased costs;

(b)    That Energy Transfer's contractors lost returns of drilling mud on the first day of their HDD activities which slowed progress, caused delays, resulted in stoppages, and increased the costs of the Project.  Returns were lost repeatedly throughout the 27 days of drilling at the Tuscarawas River site.  In order to combat drilling difficulties and keep up with the extremely tight

construction schedule set by Energy Transfer, Energy Transfer's contractors "intentionally and routinely" utilized toxic diesel fuel and other unapproved additives to accelerate the drilling. Once the April 2017 Environmental Disaster was discovered, construction progress was slowed and eventually halted. The resulting investigation by the FERC also slowed progress and increased costs for the Rover Project;

        (c)     That Defendants were well aware of, or recklessly disregarded, the delays brought on by the April 2017 Environmental Disaster and the pervasive drilling difficulties experienced by the Rover Project, by and through Energy Transfer employees working directly on the Rover Project and the Individual Defendants' continuing communications with those employees. In fact, on multiple occasions during the Rover Project, one or more Defendants referred to specific, recent conversations with the Rover Project construction team, including twice during Energy Transfer's 4Q'16 Earnings Call held on February 23, 2017. During that call, defendant McCrea stated: "We have talked with [the Rover construction companies] last week," and that he "met with one of the lead construction companies a couple of weeks ago for a number of reasons." Moreover, Defendants, through Rover, received communications from various government agencies alerting them of stoppages, inquiries, and investigations. For example, on April 14, 2017, the Ohio EPA issued a violation notice to Rover stemming from the April 2017 Environmental Disaster, and on May 10, 2017 the FERC's OEP issued a public letter to Rover halting the HDD activities for the Project. Additionally, on May 12, 2017, the Ohio EPA informed Rover that hotline tips suggested diesel might be present in the drilling mud, which was sure to bring about additional delays through testing and investigation of the drilling sites. Ex. A, Appendix A at 27. On May 26, 2017, the Ohio EPA informed Energy Transfer and the FERC that testing of drilling fluid near the site of the April 2017 Environmental Disaster revealed the presence of petroleum hydrocarbon constitutes,

commonly found in diesel fuel. *Id.* By June 1, 2017, the FERC's Enforcement Staff decided to immediately initiate an investigation to determine the underlying causes of the April 2017 Environmental Disaster. *Id* at 28. On July 17, 2017, Rover was also under a cease and desist order from WVDEP for drilling at this time, which similarly delayed construction of the Rover Project;

       (d)     That Energy Transfer failed to maintain adequate internal controls and procedures for the Rover Project, including failing to maintain proper documentation of the drilling activities prior to the April 2017 Environmental Disaster, failing to properly train individuals working on the project, and failing to have the required number of environmental monitors on site. *Id.* at 41; and

       (e)     That the presence of diesel fuel was not caused by the equipment operating during the clean-up of the inadvertent release or by deliberate or malicious acts of individuals opposed to the Project, but rather was caused by the pressure placed on construction crews by Defendants.

       93.     Defendants' August 4, 2017 Letter had the intended effect. Investors believed that Rover, and Energy Transfer, were not the culprits. The deflection of blame also shrouded the continued construction delays and the potential that the FERC would find Defendants responsible for the environmental disaster at the Tuscarawas River. Multiple outlets reported that the presence of diesel fuel in the drilling mud was possibly caused by "[s]abotage or leaky cleanup equipment." Another media outlet repeated Energy Transfer's statement that "'the data is, at best, inconclusive – it could reflect an intentional introduction of diesel, an unreported spill, or sabotage.'" Neither the Ohio EPA nor the FERC could comment on the contamination's possible sources because of the FERC's ongoing investigation, so the media and the market were simply left with Defendants' deflections.

### 2.    August 9, 2017 10-Q and Earnings Call

94.    On August 9, 2017, Energy Transfer filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2017 (the "2Q'17 10-Q"). The 2Q'17 10-Q was signed by defendant Long, and included SOX Certifications signed by defendants Long and McReynolds. The same day, after the market closed, Energy Transfer held an earnings call with investors for the second quarter of 2017, to discuss the Partnership's second quarter 2017 results (the "2Q'17 Earnings Call").

95.    Prior to the 2Q'17 Earnings Call, analysts and investors were laser focused on the Rover Project. For example, BMO stated on July 16, 2017 that it would "expect investor discussion on the earnings call to focus around the following topics . . . updates to Rover in service timelines in light of the FERC's recent mandate for ETP to complete mitigation tasks prior to the pipeline's approval." On July 27, 2017, RBC agreed saying that the first thing it would "listen for" was "new timing for Rover start-up."

96.    The 2Q'17 10-Q briefly addressed the Ohio EPA's allegations against Energy Transfer for various environmental violations, including the April 2017 Environmental Disaster, specifically stating, "[t]he Ohio EPA has proposed penalties of more than $900,000" for the "alleged violations [that] occurred from April to July, 2017" during the Rover Project.

97.    Energy Transfer also claimed it had notified the FERC of its intention to implement what it called the J.D. Hair Report's "suggestions" as well as additional voluntary protocols:

> On July 31, 2017, the FERC issued an independent third party assessment of what led to the release at the Tuscarawas River site and what Rover can do to prevent reoccurrence once the HDD suspension is lifted. ***Rover has notified the FERC of its intention to implement the suggestions in the assessment and to implement additional voluntary protocols***.

98.     Energy Transfer also updated investors as to 2017 CapEx, disclosing that, through June 30, 2017, total CapEx was $2.87 billion – 81% of the high end of full year 2017 CapEx guidance provided by Defendants on February 24, 2017.

99.     During the 2Q'17 Earnings Call held later on August 9, 2017, Energy Transfer revealed that Phase 1 was still not in service and the FERC had not approved the resumption of HDD drilling.[5]  However, defendant Long reassured investors that, although the July 1 deadline for the completion of Phase 1 had passed, Phase 1 was "substantially complete" and the Phase 2 "in service" schedule remained in "November or early December [2017] with full commercial service in January [2018]."  Defendant Long again stated that "[o]ur construction and engineering groups *remain very focused on safely and responsibly* bringing . . . Rover . . . into service."

100.     Analysts again questioned the "plan and service dates" in response to the "unfavorable" construction issues on the Rover Project.  Defendant Ramsey responded that they were "having continuing conversations with [the FERC], and we hope to have all this resolved *and moving forward pretty quickly*."  When pressed as to whether Energy Transfer was "fairly confident that Phase 1a and b" would be in service, defendant Ramsey responded unequivocally: "Yes" and added "we are very confident we're going to get this thing in service."

101.     During the 2Q'17 Earnings Call, Defendants also provided an update on CapEx. Defendant Long informed investors that halfway through the year, as of June 30, 2017, Energy Transfer had spent over three quarters of its projected 2017 growth CapEx – $2.7 billion of the $3.355 to $3.515 billion range – provided just six months earlier in Energy Transfer's FY 2016 10-K. Defendant Long also informed investors that left "about $2.2 billion remaining to be spent in the second half of the year."

---

[5]     Around this time, likely because of continuing delays and construction issues, Energy Transfer started referring to Phase 1 as Phase 1A and Phase 1B.

102.     Regarding the alleged release of diesel fuel that caused the April 2017 Environmental Disaster, Defendants repeated their denials of any knowledge of the source of the diesel. Defendant Ramsey stated: "As we've made very clear, we do not know the source of the diesel [in] the drilling mud." After claiming there were "a lot [of] theories put out there about it," defendant Ramsey reiterated: "[W]e absolutely do not know the source of it." Defendant Ramsey continued to downplay the FERC's review by assuring investors that Energy Transfer "will get through that issue with FERC *without any real big problems*."

103.     But, as Defendants knew or recklessly disregarded, the Rover Project would neither be completed on time nor within budget.

104.     While Defendants were telling the market the Rover Project's timeline was not changing, they were impeding regulators' investigations into the April 2017 Environmental Disaster. The director of the Ohio EPA, Craig Butler, confirmed that the Ohio EPA did not "'think [Energy Transfer was] taking Ohio seriously'" and that "'frustration is really high'" at the agency with the Partnership. He stated: "'[N]ormally when we have . . . a series of events like this, companies respond with a whole lot of contrition and whole lot of commitment. We haven't seen that. It's pretty shocking.'"

105.     Defendants vigorously disputed this account, and proclaimed total cooperation with the FERC and the Ohio EPA. For example, during the 2Q'17 Earnings Call on August 9, 2017, defendant Ramsey stated: "We've been working closely with the Ohio EPA. In fact, we're working closely towards resolving all those issues with Ohio." Regarding the FERC's initial investigation into the April 2017 Environmental Disaster, defendant Ramsey said: "[W]e continue to work with FERC. . . . They've made things pretty clear that we have been completely transparent with them."

- 34 -

But, Defendants were aware throughout the Class Period that Energy Transfer was not "completely transparent" with the FERC.

106.    The statements in ¶¶96-102, 105 were materially false and misleading or omitted facts necessary to make them not misleading when made, for the reasons stated herein, including:

(a)    That Energy Transfer omitted the impact the additional "suggestions" and protocols would have on the timing and the cost of the Rover Project;

(b)    That Defendants fostered a corporate culture in which environmental compliance was "treated[,] in practice, as an afterthought," and efforts to comply were "ineffective and superficial." Ex. A, Appendix A at 36. Indeed, Defendants failed to define the roles and responsibilities of its inspectors to be in compliance with the FERC's Certificate Order. *Id.* Once on site at the Rover Project, those inspectors "lacked a meaningful presence." *Id.* In short, Defendants "favored speed and construction progress over regulatory compliance." *Id.* at 42. This corporate culture inevitably caused environmental disasters, like the April 2017 Environmental Disaster, which both delayed construction and increased costs;

(c)    That Defendants knew, or recklessly disregarded, that the Project would not meet its stated in-service deadline. According to a cost comparison statement filed with the FERC in May 2019 (the "Cost Comparison Statement"), *infra* ¶157, the FERC's delay in providing Rover the FERC's Certificate Order "prohibited the original construction method required in order to meet in-service commitments" and kept it from staying to its original schedule. This delay was complete, present, and known to, or recklessly disregarded by, Defendants before February 2017, a month prior to the Project starting construction. Moreover, once construction on the Project began, Defendants were further aware, or recklessly disregarded, that the Rover Project would experience additional delays. On the first day of HDD drilling, Energy Transfer's contractors lost returns of drilling mud,

which, as Defendants were aware, or recklessly disregarded, slowed progress, caused delays, resulted in stoppages, and increased the costs of the Project. Returns were lost repeatedly throughout the 27 days of drilling at the Tuscarawas River site. In order to combat drilling difficulties and keep up with the extremely tight construction schedule set by Energy Transfer, Energy Transfer's contractors "intentionally and routinely" utilized toxic diesel fuel and other unapproved additives to accelerate the drilling. Once the April 2017 Environmental Disaster was discovered, construction progress was slowed and eventually halted. ¶¶59-66, 69, 78, 80-81, 83, 85-87. The resulting investigation by the FERC also slowed progress and increased costs for the Rover Project;

(d)    That Defendants were well aware of, or recklessly disregarded, the delays brought on by the April 2017 Environmental Disaster and the pervasive drilling difficulties experienced by the Rover Project. This knowledge came by and through Energy Transfer employees working directly on the Rover Project and the Individual Defendants' continuing communications with those employees. In fact, on multiple occasions during the Rover Project, one or more Defendants referred to specific, recent conversations with the Rover Project construction team, including twice during Energy Transfer's 4Q'16 Earnings Call held on February 23, 2017. During that call, defendant McCrea stated: "We have talked with [the Rover construction companies] last week," and that he "met with one of the lead construction companies a couple of weeks ago for a number of reasons." Moreover, Defendants, through Rover, received communications from various government agencies alerting them of stoppages, inquiries, and investigations. For example, on April 14, 2017, the Ohio EPA issued a violation notice to Rover stemming from the April 2017 Environmental Disaster, and on May 10, 2017 the FERC's OEP issued a public letter to Rover halting the HDD activities for the Project. Additionally, on May 12, 2017, the Ohio EPA informed Rover that hotline tips suggested diesel might be present in the drilling mud, which was sure to bring

about additional delays through testing and investigation of the drilling sites. On May 26, 2017, the Ohio EPA informed Energy Transfer and the FERC that testing of drilling fluid near the site of the April 2017 Environmental Disaster revealed the presence of petroleum hydrocarbon constitutes, commonly found in diesel fuel. By June 1, 2017, the FERC's Enforcement Staff decided to immediately initiate an investigation to determine the underlying facts that led to the presence of petroleum hydrocarbons in the drilling fluid. On July 17, 2017, Rover was also under a cease and desist order from WVDEP for drilling until this time, which similarly delayed construction of the Rover Project;

(e)     That Energy Transfer failed to maintain adequate internal controls and procedures for the Rover Project, including failing to maintain proper documentation of the drilling activities prior to the April 2017 Environmental Disaster, failing to properly train individuals working on the project, and failing to have the required number of environmental inspectors on site. Ex. A, Appendix A at 42;

(f)     That Defendants were aware, or recklessly disregarded, that the Project would not meet its most recent projection – the $3.8 billion budget given to investors at the 4Q'16 Earnings Call. First, Rover filed its affirmative statement, which accepted the FERC's Certificate Order and confirmed its projected cost at $4.08 billion, on February 3, 2017. Nothing about the Rover Project's progress between February 3, 2017 and the 2Q'17 Earnings Call suggested that Defendants should lower the Project's estimated cost by over $300 million, nor did they provide any explanation for doing so. In fact, the opposite was true. According to Rover's Cost Comparison Statement, *infra* ¶157, massive cost overruns were incurred before construction even began. Rover claimed the FERC's delay in granting it the FERC's Certificate Order caused contractor cost overruns, "required pipe to be white washed," resulted in "an increase in engineering and inspection costs," and "an

increase in service costs."  Moreover, according to Defendants, and as noted in ¶157, the Rover

Project was "prohibited" from being completed according to its original schedule, simply due to the

delay that occurred prior to February 2, 2017.  Investors were left unaware of this "prohibit[ion]."

Thus, defendants were aware that the Rover Project would not be completed on schedule before

construction ever began.  But it gets worse.  For the reasons stated in ¶106(c)-(d), Defendants were

also aware that the Project would be delayed, and that the cost of the Rover Project was intrinsically

connected to its cost; and

        (g)     That Defendants knew, or recklessly disregarded, the source of the diesel fuel

in the drilling mud and that it was, and would continue to lead to big issues with the FERC.

      107.     As a result of this information, the price of Energy Transfer units dropped 3.85% over

two trading days, to close at $16.99 per share on August 12, 2017.

      108.     Nonetheless, analysts continued to believe Defendants' representations that the Rover

Project would be entirely complete by the end of the year.  For example, on September 14, 2017,

Wells Fargo reported on the Ohio EPA's fines against Rover but noted that "[m]anagement remains

confident in Rover's timeline."

      109.     On August 21, 2017, the FERC authorized its Enforcement Staff to conduct a non-

public, formal investigation on the underlying facts that led to the presence of diesel in the drilling

fluid at the April 2017 Environmental Disaster site.  Although Defendants spoke frequently about the

Rover Project, its costs, and associated timeline, Defendants failed to disclose to investors that they

had been under formal investigation for 717 days.  Rather, Defendants went to great efforts to thwart

the investigations, including by delaying document production, denying access to all witnesses save

those "least relevant," and deleting relevant evidence.  Most notably, Energy Transfer and Rover's

EVP of Engineering and Construction, Mahmoud, deleted all data from his phone, despite preservation notices issued by the FERC's OEP and Enforcement Staff.

110.    On August 9, 2017, nearly two months after issuing the July 17, 2017 cease and desist order against Rover, the WVDEP conducted an investigation of the site and allowed Rover to resume drilling.

### 3.    November 7, 2017 10-Q and November 8, 2017 Earnings Call

111.    On November 7, 2017, after the market closed, Energy Transfer filed with the SEC its quarterly report on Form 10-Q for the quarter ending September 30, 2017 ("3Q'17 10-Q").  The 3Q'17 10-Q was signed by defendant Long, and included SOX Certifications signed by defendants Long and McReynolds.  The next day, after the market closed, Energy Transfer held an earnings call with analysts and investors to discuss the Partnership's financial results (the "3Q'17 Earnings Call").

112.    Prior to the 3Q'17 Earnings Call, analysts emphasized the need for an update on the Rover Project timelines.  BMO listed "timing updates to Rover's Phase II in service given ongoing challenges during construction" as the first issue to be discussed on the earnings call.  JP Morgan, RBC, and Scotia Howard echoed that sentiment, stating: "On the call, we will be listening for updated thoughts on the ME2 and Rover timelines given regulatory concerns," "we will listen for . . . [u]pdated timing for Rover start-up," and "we will look for updates on the Rover and Mariner East 2 pipeline projects nearing completion," respectively.  Stephens added that "[m]uch of the focus on the conference call will be . . . updates on expected in service dates of Rover and ME2."

113.    In the 3Q'17 10-Q, Energy Transfer disclosed that total CapEx for the first nine months of 2017 was $6.10 billion and growth CapEx of $4.8 billion.  This was a vast overshot of Defendants' prior projections.  Energy Transfer's FY 2016 10-K included a 2017 total CapEx projection of between $3.355 billion and $3.515 billion.  Nine months into the year, Energy Transfer was $2.5 billion over its 2017 total CapEx projection, and again over its most recent growth CapEx

guidance.  Just three months earlier, defendant Long had assured investors that the $2.87 billion in

growth CapEx incurred in the first half of 2017 only left "$2.2 billion remaining to be spent."

114.    During Energy Transfer's 3Q'17 Earnings Call, defendant Long increased the

projected in service date for the entire Rover Project by roughly three months from Defendants' prior

projection of "the end of the year":

> Yesterday, we also received the J.D. Hair reports from FERC for the remaining
> HDDs on Rover, which *should allow us to resume construction on these drills in
> short order*.  Both of these developments provide us with *more certainty in meeting
> our projected in-service dates*.
>
> For Phase 1b, *drilling operations on our remaining HDD are nearly
> complete*.  We expect this phase will be in service and that we will be collecting
> demand fees on all of Phase 1 before the end of this year.  In addition, construction
> of Phase 2 continues, *and we feel confident the entire pipeline will be in service by
> the end of the first quarter of 2018*.

115.    Defendant Long also provided a "CapEx update" during his prepared remarks.  Long

stated Energy Transfer then expected 2017 growth CapEx to total $5.1 billion, a $100 million

increase from the number provided on the 2Q'17 Earnings Call.

116.    Defendant Long also continued to harp on Energy Transfer's alleged focus on safety

and responsibility during the 3Q'17 Earnings Call, stating: "Our construction and engineering groups

remain very focused on safely and responsibly bringing our projects into service, including the final

phases of Rover."

117.    The statements in ¶¶113-116 were materially false and misleading or omitted facts

necessary to make them not misleading when made, for the reasons stated herein, including:

(a)    That Phase 1 was not put into service until December 15, 2017 – more than

five months after Energy Transfer confidently and repeatedly stated it would be in service.  But the

delays with Phase 2 continued;

(b)    That the Rover Project would cost vastly more than Defendants disclosed to the market;

(c)    That drilling was not nearly complete and would not resume in short order;

(d)    That Defendants did not have more certainty in meeting in service dates or confidence that the Project would be in service by the end of the first quarter of 2018;

(e)    That Defendants fostered a corporate culture in which environmental compliance was "treated[,] in practice, as an afterthought," and efforts to comply were "ineffective and superficial." Ex. A, Appendix A at 36. Indeed, Defendants failed to define the roles and responsibilities of its inspectors to be in compliance with the FERC's Certificate Order. *Id.* at 35. Once on site at the Rover Project, those inspectors "lacked a meaningful presence." *Id.* In short, Defendants "favored speed and construction progress over regulatory compliance." *Id.* at 42. This corporate culture inevitably caused environmental disasters, like the April 2017 Environmental Disaster, which both delayed construction and increased costs;

(f)    That Defendants were well aware of, or recklessly disregarded, the delays brought on by the April 2017 Environmental Disaster and the pervasive drilling difficulties experienced by the Rover Project. This knowledge came by and through Energy Transfer employees working directly on the Rover Project and the Individual Defendants' continuing communications with those employees. On multiple occasions during the Rover Project, one or more Defendants referred to specific, recent conversations with the Rover Project construction team, including twice during Energy Transfer's quarterly earnings call held on February 23, 2017. During that call, defendant McCrea stated: "We have talked with [the Rover construction companies] last week," and that he "met with one of the lead construction companies a couple of weeks ago for a number of reasons." Moreover, Defendants, through Rover, received communications from various

government agencies alerting them of stoppages, inquiries, and investigations. Defendants could not and would not meet the in service deadlines provided to date. The FERC still had not approved resumption of HDD drilling activities for the Rover Project and the FERC's investigation remained ongoing; and

(g)    That Defendants knew, or recklessly disregarded, that the Project would cost more than the $3.8 billion quoted to investors. For the reasons stated at ¶157, Defendants were aware, or recklessly disregarded, that the Project would not meet its deadlines prior to beginning construction. For the reasons stated at ¶¶59-66, 69, 78, 80-81, 83, 85-87, 104, 109, once construction began, HDD crews experienced costly, repeated delays, even before the 1Q'18 was filed.

118.    After learning of these troubling developments, securities analysts expressed concern over the Rover Project delays and costs, causing the price of Energy Transfer units to drop 6.4% over two trading days, to close at $17.51 per share on November 9, 2017.

119.    Indeed, Wells Fargo lowered its 2018 discounted cash flow estimates by 6.8% "to reflect delays," and updated its model to now assume an end-of-year in-service date for Phase 1 of the Rover Project, compared to the September 30, 2017 in service assumption given in Wells Fargo's August 2017 report. Wells Fargo further stated that "[g]iven the project delays, we believe ETP is likely to pause distribution growth until 2019." Similarly, Morgan Stanley reduced its Energy Transfer price target by over 4.8% even following what it called an "overall [earnings] beat," noting Energy Transfer had been "running into delays regarding HDD drilling."

120.    Defendants, however, convinced analysts that they had the Rover Project under control. Morgan Stanley stated: "Project execution remains challenged, but ***management offered confidence in being able to work*** through ***their remaining issues***" and "management continues to

move the project towards its full in-service by the end of this year," adding that "Phase II remains on track and will be in service by the end of 1Q18." UBS also bought into the new deadlines, stating: "[Energy Transfer] expect[s] an in service date for Phase 2 with it fully completed by the end of 1Q." Similarly, BMO stated on November 13, 2017 that the Rover Pipeline was "expected to be fully operational by the end of Q1'18."

121.    The FERC's investigation also continued and Energy Transfer continued to receive notifications of environmental violation concerns from regulatory agencies. For example, in January 2018, Energy Transfer received another letter from the Ohio EPA regarding environmental violation concerns.

### 4.    February 22, 2018 Earnings Call and February 23, 2018 Form 10-K

122.    Analysts were again antsy for updates on the completion of the Rover Project. On February 21, 2018, Stephens noted that "[m]uch of the focus on the call will be the ME2 and Rover updates." J.P. Morgan was "[w]aiting for 2018 capex guidance and Rover/ME-II updates" on the earnings call, adding that "Phase II should enter service this quarter."

123.    On February 22, 2018, after the market closed, Energy Transfer hosted a conference call with analysts and investors to discuss the Partnership's fourth quarter and year end 2017 results (the "4Q'17 Earnings Call"). During the 4Q'17 Earnings Call, Defendants put a false spin on the progress of Phase 2 of the Rover Project. Defendant Long stated that Energy Transfer "recently received authorization from FERC to resume HDD operations at the Tuscarawas River for Rover," and Energy Transfer "remain[ed] committed to continue to comply with the approved HDD plans and the additional measures requested and approved by FERC." Defendant Long characterized Phase 2 as "more than 99% complete with construction for the full project and more than 82% complete with the HDDs." Defendants updated the projected Phase 2 in service date from their last

assurance of "by the end of the first quarter of 2018," which was then a month away, by telling investors that Phase 2 would be "completed *throughout the next few months*."

124.    Defendants also announced for the *first time* the financial impact the delays on the Rover Project had on Energy Transfer's financial condition.  Defendant Long told investors "[f]or 2018, we expect to spend approximately $4.5 billion on organic growth projects.  *The increase from our previous guidance is due to higher cost resulting from delays on our Rover* and Mariner East projects, newly approved projects and carryover from 2017."  Analysts expressed concern and confusion over the sudden, ten-figure increase.  One analyst asked, "[d]id you update your CapEx guidance for the year from $3 billion on the growth side?  Is there a new number?"  Defendant Long replied: "Yes.  We updated it from the $3 billion we had."

125.    The next day, just before the market closed on February 23, 2018, Energy Transfer filed with the SEC its annual report on Form 10-K for the period ended December 31, 2017 (the "FY 2017 10-K").  Defendants McReynolds and Long both signed the FY 2017 10-K.  Defendants McReynolds and Long also signed SOX Certifications, wherein they certified that "[the FY 2017 10-K] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading" and that "the information contained in the [FY 2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."  Certain of the Individual Defendants signed similar statements in connection with the Forms 10-K and 10-Q quarterly reports filed with the SEC during the Class Period as explained, *supra*, ¶¶36-41.

126.    The FY 2017 10-K further detailed that Project delays contributed to cost overruns and in turn, increased the growth CapEx for 2017.  Energy Transfer had most recently guided investors in its 3Q'17 Earnings Call that it expected 2017 growth CapEx to be $5.1 billion.  The FY

2017 10-K disclosed Energy Transfer's growth CapEx for 2017 was $5.47 billion – more than

$300 million over the most recent projection, and 150% or approximately $2 billion over the

estimate provided to investors a year earlier.

127.    The FY 2017 10-K continued, however, to mislead investors, as it highlighted the

capacity of the partially completed Rover Pipeline:

> The Rover Pipeline is a new 713-mile natural gas pipeline designed to
> transport 3.25 Bcf/d of domestically produced natural gas from the Marcellus and
> Utica Shale production areas to markets across the United States as well as into the
> Union Gas Dawn Storage Hub in Ontario, Canada, for redistribution back into the
> United States or into the Canadian market.  Currently under construction, portions of
> the pipeline are in service transporting gas from processing plants in Eastern Ohio for
> delivery to other pipeline interconnects in Eastern Ohio as well as the Midwest Hub
> near Defiance, Ohio, where the gas will be delivered for distribution to markets
> across the United States.  The Rover Pipeline Phase 1A and 1B are in service with a
> capacity of approximately [billion cubic feet per day].

128.    On the subject of the April 2017 Environmental Disaster, the FY 2017 10-K

emphasized the progress that Rover achieved in complying with the FERC's requirements:

> In addition, on May 10, 2017, the FERC prohibited Rover from conducting
> HDD activities at 27 sites in Ohio.  On July 31, 2017, the FERC issued an
> independent third party assessment of what led to the release at the Tuscarawas River
> site and what Rover can do to prevent reoccurrence once the HDD suspension is
> lifted.***Rover notified the FERC of its intention to implement the suggestions in the
> assessment and to implement additional voluntary protocols.  In response, FERC
> authorized Rover to resume HDD activities at certain sites.***On January 24, 2018,
> FERC ordered Rover to cease HDD activities at the Tuscarawas River HDD site
> pending FERC review of additional information from Rover.  Rover continues to
> correspond with regulators regarding drilling operations and drilling plans at the
> HDD sites where Rover has not yet completed HDD activities, including the
> Tuscarawas River HDD site.  The timing or outcome of this matter cannot be
> reasonably determined at this time.  ***We do not expect there to be a material impact
> to its results of operations, cash flows or financial position***.

129.    The FY 2017 10-K did not disclose the FERC's formal investigation, but noted that

Defendants "continue[d] to correspond with regulators regarding drilling operations and drilling

plans . . . including the Tuscarawas River HDD site."

- 45 -

130.    The statements in ¶¶123-129 were materially false and misleading or omitted facts necessary to make them not misleading when made, for the reasons stated herein, including:

(a)    That Defendants fostered a corporate culture in which environmental compliance was "treated[,] in practice, as an afterthought," and efforts to comply were "ineffective and superficial." Ex. A, Appendix A at 36. Indeed, Defendants failed to define the roles and responsibilities of its inspectors to be in compliance with the FERC's Certificate Order. *Id.* at 35. Once on site at the Rover Project, those inspectors "lacked a meaningful presence." *Id.* In short, Defendants "favored speed and construction progress over regulatory compliance." *Id.* at 42. This corporate culture inevitably caused environmental disasters, like the April 2017 Environmental Disaster, which both delayed construction and increased costs;

(b)    That the FY 2017 10-K omitted the critical fact that the FERC's Enforcement Staff had already initiated a formal investigation into the April 2017 Environmental Disaster, a fact that Defendants knew no later than August 2017. In direct contrast, Defendants had already disclosed the FERC's Enforcement Staff investigation into a different Rover Project incident, namely Rover's acquisition and destruction of an historic home, in its FY 2017 10-K;

(c)    That Defendants were well aware of, or recklessly disregarded, the delays brought on by the April 2017 Environmental Disaster and the pervasive drilling difficulties experienced by the Rover Project. This knowledge came by and through Energy Transfer employees working directly on the Rover Project and the Individual Defendants' continuing communications with those employees. Defendants could not and would not meet the in service deadlines provided to date. The FERC's investigation continued and remained an ongoing threat to the Project's progress. Additional investigations by the Ohio EPA in January 2018 also delayed construction and increased costs;

- 46 -

(d)    That Energy Transfer failed to maintain adequate internal controls and procedures for the Rover Project, including failing to maintain proper documentation of the drilling activities prior to the April 2017 Environmental Disaster, failing to properly train individuals working on the project, and failing to have the required number of environmental inspectors on site. Ex. A, Appendix A at 41; and

(e)    That Defendants still understated the Rover Project's budgeted cost – which Defendants still had not updated to investors since the 4Q'16 Earnings Call's $3.8 billion projection. In fact, Defendants were aware, or recklessly disregarded, that the Rover Project would not meet its budget, and would thus, have greater CapEx implications in future periods than previously disclosed. Moreover, for the reasons stated in ¶130(c), Defendants were aware, or recklessly disregarded, that construction delays occurred and would be costly to Energy Transfer.  And as explained in ¶¶59-66, 69, 78, 80-81, 83, 85-87, 104, 109, 121, 157, Defendants were also aware, or recklessly disregarded, that construction difficulties cast further doubt on the already "prohibited" budget and Project schedule.  Furthermore, Defendants were aware of construction difficulties experienced by HDD crews on site.  Finally, Defendants were aware, or recklessly disregarded, of the cost overruns the Rover Project had already incurred, which made the $3.8 billion they told investors the Project would cost virtually unachievable.  According to Defendants, before the 4Q'16 Earnings Call, and before construction ever began, Energy Transfer had already spent over $1.5 billion on the Rover Project.  Precision's HDD crews had yet to begin work under Precision's $1.5 billion contract. Moreover, Precision was not the only contractor working on the Rover Project. Ex. A, Appendix A at 10.  Defendants were thus aware, or recklessly disregarded, that the remaining budget of $800 million – accounting for the $3 billion already spent – was wholly insufficient to cover the Project's remaining costs. According to Defendants' May 2019 Cost Comparison Statement, ¶157,

these remaining costs included planning and re-planning following the April 2017 Environmental Disaster, increased regulatory costs, and added contractor labor costs and fall through costs.

131.    Energy Transfer units declined 2.0% over two trading days in response to the news of additional Project delays and cost overruns.  Energy Transfer units closed at $16.34 on February 26, 2018.

### 5.    May 10, 2018 10-Q and May 10, 2018 Earnings Call

132.    On May 10, 2018, Energy Transfer filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2018 (the "1Q'18 10-Q").  The 1Q'18 10-Q was signed by defendant Long, and included SOX Certifications signed by defendants Long and McReynolds. That same day, Energy Transfer held a conference call with analysts and investors to discuss the Partnership's first quarter 2018 results ("the 1Q'18 Earnings Call").

133.    On the subject of the April 2017 Environmental Disaster, the 1Q'18 10-Q emphasized the progress that Rover achieved in complying with the FERC's requirements and authorizations received from FERC:

> In addition, on May 10, 2017, the FERC prohibited Rover from conducting HDD activities at 27 sites in Ohio.  On July 31, 2017, the FERC issued an independent third party assessment of what led to the release at the Tuscarawas River site and what Rover can do to prevent reoccurrence once the HDD suspension is lifted.  Rover has implemented the suggestions in the assessment and additional voluntary protocols. ***The FERC has authorized Rover to resume HDD activities at all sites***.

134.    The 1Q'18 10-Q also disclosed that Energy Transfer's total CapEx for the first quarter of 2018 was $1.72 billion – over 38% of its total year estimate provided three months prior.

135.    During the 1Q'18 Earnings Call, despite the CapEx already incurred, defendant Long confirmed the $4.5 billion 2018 growth CapEx projection provided on the 4Q'17 Earnings Call.

136.    The statements in ¶¶133-135 were materially false and misleading or omitted facts necessary to make them not misleading when made, for the reasons stated herein, including:

(a)     That Defendants fostered a corporate culture in which environmental compliance was "treated[,] in practice, as an afterthought," and efforts to comply were "ineffective and superficial."  Ex. A, Appendix A at 36.  Indeed, Defendants failed to define the roles and responsibilities of its inspectors to be in compliance with the FERC's Certificate Order.  *Id.*  Once on site at the Rover Project, those inspectors "lacked a meaningful presence." *Id.*  In short, Defendants "favored speed and construction progress over regulatory compliance."  *Id.* at 42.  This corporate culture inevitably caused environmental disasters, like the April 2017 Environmental Disaster, which both delayed construction and increased costs;

(b)     That the 1Q'18 10-Q omitted the critical fact that the FERC's Enforcement Staff had already initiated a formal investigation on this matter, a fact that Defendants knew no later than August 2017.  In direct contrast, Defendants had already disclosed the FERC's Enforcement Staff investigation into a different Rover Project incident, namely Rover's acquisition and destruction of an historic home, in its FY 2017 10-K;

(c)     That Energy Transfer failed to maintain adequate internal controls and procedures for the Rover Project, including failing to maintain proper documentation of the drilling activities prior to the April 2017 Environmental Disaster, failing to properly train individuals working on the project, and failing to have the required number of environmental inspectors on site.  Ex. A, Appendix A at 41;

(d)     That Energy Transfer's statements about the J.D. Hair Report were misleading because they did not disclose the impact the findings in the J.D. Hair report would have on the construction timeline.  Implementing the J.D. Hair Report's "suggestions" as well as additional voluntary protocols would slow down or delay construction and increase the costs for the Rover Project; and

(e)     That, for the reasons stated in ¶130(c), Defendants were aware and kept apprised of the incurred Rover Project costs and delays, and thus knew, or recklessly disregarded, that the most recent estimate given to investors of $3.8 billion – months prior to the 1Q'18 Earnings Call – was misleading.

### 6.     August 9, 2018 10-Q and Earnings Call

137.    On August 9, 2018, Energy Transfer filed with the SEC its quarterly report for the quarter ended June 30, 2018 (the "2Q'18 10-Q"). The 2Q'18 10-Q was signed by defendant Long and included SOX Certifications signed by defendants Long and McReynolds. That same day, Energy Transfer held a conference call with analysts and investors to discuss the Partnership's second quarter 2018 results (the "2Q'18 Earnings Call").

138.    On the subject of the April 2017 Environmental Disaster, the 2Q'18 10-Q discussed the continued drilling and cleanup efforts at the Tuscarawas River site, and downplayed the FERC and Ohio EPA investigations. The 2Q'18 10-Q stated in relevant part:

> In January 2018, Ohio EPA sent a letter to the FERC to express concern regarding drilling fluids lost down a hole during horizontal directional drilling ("HDD") operations as part of the Rover Pipeline construction. Rover sent a January 24 response to the FERC and stated, among other things, that as Ohio EPA conceded, Rover was conducting its drilling operations in accordance with specified procedures that had been approved by the FERC and reviewed by the Ohio EPA. In addition, although the HDD operations were crossing the same resource as that which led to an inadvertent release of drilling fluids in April 2017, the drill in 2018 had been redesigned since the original crossing. Ohio EPA expressed concern that the drilling fluids could deprive organisms in the wetland of oxygen. Rover, however, has now fully remediated the site, a fact with which Ohio EPA concurs.

139.    The 2Q'18 10-Q further disclosed the cost of the Project Rover delays. Energy Transfer stated that, through the first half of 2018, total CapEx was $3.48 billion. Additionally, Energy Transfer projected 2018 growth CapEx of between $4.5 billion and $4.8 billion – a $150 million increase from the guidance provided six months earlier in the FY 2017 10-K.

140.    During the 2Q'18 Earnings Call, defendant Long disclosed the increase in expected growth CapEx and claimed that "[t]he increase is primarily due to new growth projects."  When questioned about where the money was going, defendant Long said the "new projects" were "smaller ones that we've not talked about yet."

141.    The statements in ¶¶138-140 were materially false and misleading or omitted facts necessary to make them not misleading when made, for the reasons stated herein, including:

(a)    That the 2Q'18 10-Q omitted the critical fact that the FERC's Enforcement Staff had already initiated a formal investigation in the April 2017 Environmental Disaster, a fact that Defendants knew no later than August 2017.  In direct contrast, Defendants had already disclosed the FERC's Enforcement Staff investigation into a different Rover Project incident, namely Rover's acquisition and destruction of an historic home, in its FY 2017 10-K;

(b)    That Energy Transfer failed to maintain adequate internal controls and procedures for the Rover Project including failing to maintain proper documentation of the drilling activities prior to the April 2017 Environmental Disaster, failing to properly train individuals working on the project, and failing to have the required number of environmental inspectors on site. Ex. A, Appendix A at 29, 41-42;

(c)    That for the reasons stated in ¶130(c), Defendants were aware and kept apprised of the incurred Rover Project costs and delays, and thus knew, or recklessly disregarded, that the most recent estimate given to investors of $3.8 billion – months prior to the 2Q'18 Earnings Call – was misleading; and

(d)    That Project delays were, in fact, to blame for missed projections.

### 7.    The Rover Project Construction Is Finally Complete

142.    On November 8, 2018, Energy Transfer filed with the SEC its quarterly report for the quarter ended September 30, 2018 (the "3Q'18 10-Q").    The 3Q'18 10-Q, included SOX Certifications signed by defendants Long and Warren.

143.    On the subject of the April 2017 Environmental Disaster, the 3Q'18 10-Q repeated verbatim the 2Q'18 10-Q disclosure detailed in ¶138.

144.    The 3Q'18 10-Q also provided an update on cost overruns.  Energy Transfer reported that total CapEx for the first three quarters of 2018 alone was $5.08 billion.

145.    Later that day, after the market closed, Energy Transfer held an earnings call with analysts and investors to discuss the Partnership's third quarter 2018 results (the "3Q'18 Earnings Call").  During that call, defendant Long revealed that the entire Rover Project was finally in service – nearly 20 months after construction began.

146.    Additionally, defendant Long repeated the CapEx projections given in the 3Q'18 10-Q.  Defendant Long stated that, for the first three quarters of 2018, Energy Transfer spent $3.3 billion in growth CapEx, and expected to expend another $1.2 billion to $1.4 billion in the final quarter of 2018 alone, to total $4.5 billion to $4.7 billion in 2018 growth CapEx.  But Defendants failed to disclose how the FERC investigation and recent construction delays increased the cost to complete the Rover Project, and how more additional costs were the cause of the Partnership's increased CapEx.

147.    The statements in ¶¶143-146 were materially false and misleading or omitted facts necessary to make them not misleading when made, for the reasons stated herein, including:

(a)    That the 3Q'18 10-Q omitted the critical fact that the FERC's Enforcement Staff had already initiated a formal investigation in the April 2017 Environmental Disaster, a fact that Defendants knew no later than August 2017.  In direct contrast, Defendants had already

disclosed the FERC's Enforcement Staff investigation into a different Rover Project incident, namely Rover's acquisition and destruction of an historic home, in its FY 2017 10-K;

(b)     That Energy Transfer failed to maintain adequate internal controls and procedures for the Rover Project including failing to maintain proper documentation of the drilling activities prior to the April 2017 Environmental Disaster, failing to properly train individuals working on the project, and failing to have the required number of Environmental Inspectors on site. Ex. A, Appendix A at 29, 41-42;

(c)     That for the reasons stated in ¶130(c), Defendants were aware and kept apprised of the incurred Rover Project costs and delays, and thus knew, or recklessly disregarded, that the most recent estimate given to investors of $3.8 billion – months prior to the 3Q'18 Earnings Call – was misleading; and

(d)     That Project delays were, in fact, to blame for missed projections.

148.    On this news, Energy Transfer units declined 4.1% over two trading days. Energy Transfer units closed at $15.40 per share on November 12, 2018.

### 8.    Additional Information Regarding the Financial Impact of the Rover Project Delay Is Disclosed

149.    On February 21, 2019, after the market closed, Energy Transfer hosted its 4Q'18 Earnings Call with analysts and investors to discuss the Partnership's year-end and fourth quarter 2018 results. During the 4Q'18 Earnings Call, defendant Long revealed that Energy Transfer had once again missed its growth CapEx projection and disclosed that "Energy Transfer spent $4.9 billion in organic growth projects" in 2018 – more than $200 million over the highest projection provided in its 3Q'18 Earnings Call just three months prior, and $400 million over its projections in February of 2018.

- 53 -

150.    Analysts sounded the alarm.  One analyst stumbled over his words, attempting to express his frustration while peppering Defendants with questions:

> [Y]ou've had multiple years where you've spent in the $5 billion-plus range for CapEx.  ***There have been delays along the way, some of it regulatory, some of it not***. . . .  Has there been any changes in practices that Energy Transfer learnings from the past to execute better?  How are things being planned on a go-forward basis?  Just wondering if there is ways that are being taken in place where CapEx could potentially come in ***more on time and more under budget***?  And just any color around that would be greatly appreciated.

151.    Defendant Long began: "We're all staring at each other, not – pretty not who's going to answer this . . . ."  Long went on: "[Y]es, we've learned all kinds of lessons, and ***we've made mistakes*** and we are correcting those mistakes, and we'll not make those mistakes again.  So yes, we've learned a lot."  Defendant Warren admitted, "***we've made some mistake[s] that we're not proud of***."

152.    While Defendants agreed they made mistakes that affected project timelines and costs, they did not agree about whether those mistakes would be repeated.  Defendant Long stated: "[A]s far as CapEx goes . . . In my opinion, it is somewhat unique . . . so I don't really see that coming down much, Mackie.  Do you agree?"  Defendant McCrea responded: "No, I don't."

153.    The following exchange demonstrated that issues were systemic, in the view of both Defendants and the market.  After defendants Long, Warren, and McCrea each responded, the analyst followed up by asking if Energy Transfer had "expanded the management team at all in terms of project execution?"  Defendant Warren replied: "We have.  ***We've done a reorganization***.  The engineering and construction now reports directly to me . . . ."

154.    Two days later, minutes before the market closed on February 23, 2019, Energy Transfer filed with the SEC its Form 10-K for the period ended December 31, 2018 (the "FY 2018 10-K").  The FY 2018 10-K was signed by defendants Long, McCrea, Warren, McReynolds, and

Ramsey, and contained SOX Certifications signed by defendants Long and Warren.  The FY 2018

10-K detailed the increased CapEx Defendants mentioned on the 4Q'18 Earnings Call.

155.    Even though the Rover Project was finally complete, Defendants omitted in their

statements to the market that they knew no later than August 2017 that the FERC Enforcement Staff

had initiated a formal investigation into the April 2017 Environmental Disaster.  Defendants

continued to mislead the market regarding the seriousness of the FERC's formal investigation,

Energy Transfer's responsibility for the April 2017 Environmental Disaster, and the potential

liability the Partnership faced for it.

156.    On this news, the price of Energy Transfer units declined 4.1% over three trading

days to close at $14.91 per share on February 26, 2019.

157.    On May 2, 2019, Rover filed the public Cost Comparison Statement with the FERC,

detailing the extent to which the Rover Project had overshot every projection Defendants provided

investors, analysts, or the FERC.  In its Cost Comparison Statement, Rover admitted that the

Project's final cost was then projected to be $6.74 billion – over $2.5 billion more than Rover

estimated in its application filed with the FERC and nearly $3 billion more than Defendants told

investors. Detailing the source of the cost overruns, Rover clarified that $2.22 billion of the overruns

were related to labor costs.  Rover further clarified that the delays, caused in part, by compliance

issues with the FERC, caused the increased costs.  The original schedule, according to Rover,

"contemplated installing both dual pipelines A and B at the same time.  However, the FERC's

Certificate Order delay prohibited the original method required to meet in-service commitments." In

addition, according to Rover, the "FERC certificate delay" caused an "extension to the project

schedule" which "resulted in an increase in engineering and inspection costs."  Finally, Rover

admitted that part of the variance was "a result of third party legal support utilized for unforeseen

- 55 -

spill, agency matters, Contractor disputes." In other words, Defendants knew of these extreme cost overruns prior to construction beginning in March 2017 and that they were at least, in part, because of the April 2017 Environmental Disaster.

158.    Indeed, on May 30, 2019, in anticipation of the FERC's fines, Rover filed for an exemption with the Ohio Department of Taxation (the "ODT") claiming "cost overruns" and seeking a reduction in tax associated with the Rover Project. In this report, Rover offered the ODT an exact dollar figure for "Increased Regulatory [Costs] Post-Tuscarawas" of $93,732,411.00. At its hearing before the ODT, Energy Transfer representatives stated the actual cost of the pipeline was $6.2 billion – $2.4 billion more than Energy Transfer told investors at the beginning of construction, and far more than Energy Transfer ever disclosed in its SEC filings. Furthermore, Energy Transfer representatives claimed "Tuscarawas Incident & Horizontal Directional Drilling ('HDD') Re-Plan Delays" of $228,879,137 and "Contractor Costs Associated with Delays" of $322,198,358.

### 9.    August 8, 2019 10-Q

159.    On August 9, 2019, Energy Transfer filed with the SEC its 2Q'19 10-Q for the period ended June 30, 2019, and including SOX Certifications signed by defendants Long and Warren. The 2Q'19 10-Q stated, in relevant part:

> In mid-2017, FERC Enforcement Staff began a non-public investigation regarding allegations that ***diesel fuel may have been included in the drilling mud at the Tuscarawas River HDD***. Rover and the Partnership are cooperating with the investigations. Enforcement Staff has provided Rover its non-public preliminary findings regarding those investigations. The company disagrees with those findings and intends to vigorously defend against any potential penalty. Given the stage of the proceedings, and the non-public nature of the investigation, the Partnership is unable at this time to provide an assessment of the potential outcome or range of potential liability, if any.

160.    The statements in ¶159 were materially false and misleading or omitted facts necessary to make them not misleading when made, for the reasons stated herein, including:

(a)      That Defendants fostered a corporate culture in which environmental compliance was "treated[,] in practice, as an afterthought," and efforts to comply were "ineffective and superficial."  Ex. A, Appendix A at 36.  Indeed, Defendants failed to define the roles and responsibilities of its inspectors to be in compliance with the FERC's Certificate Order.  *Id.*  Once on site at the Rover Project, those inspectors "lacked a meaningful presence." *Id.*  In short, Defendants "favored speed and construction progress over regulatory compliance." *Id.* at 42.  This corporate culture inevitably caused environmental disasters, like the April 2017 Environmental Disaster, which both delayed construction and increased costs;

(b)      That the 2Q'19 10-Q did not disclose any information related to the FERC's Enforcement Staff's preliminary findings and did not provide any meaningful way for investors to assess the severity of those findings or the on-going investigation;

(c)      That Energy Transfer failed to maintain adequate internal controls and procedures for the Rover Project, including failing to maintain proper documentation of the drilling activities prior to the April 2017 Environmental Disaster, failing to properly train individuals working on the project, and failing to have the required number of Environmental Inspectors on site. Ex. A, Appendix A at 41; and

(d)      That Rover's HDD crew members testified before the FERC that adding diesel and other unapproved additives was commonplace, discussed freely around the site, and even ordered by both foremen managing construction.  ¶63.

161.    The market reacted negatively to the news of the FERC's formal investigation into the April 2017 Environmental Disaster.  The price of Energy Transfer units declined 4.6% over two trading days, to close at $13.38 on August 12, 2019.

162.    Defendants' fervent denials of responsibility and lack of adequate detail regarding the investigation were repeated verbatim in the Forms 10-K the Partnership filed for FY 2019 and 2020, which continued to mislead the market as to the FERC's investigation and the severity of the April 2017 Environmental Disaster for the reasons described in ¶160(a)-(d).

### 10.    Additional Details of Defendants' Wrongdoing on the Rover Project Are Finally Revealed

163.    The results of the FERC's investigation remained non-public until December 16, 2021, when the FERC publicly issued a FERC Order, which required Energy Transfer to "show cause why it should not be found to have violated" the NGA, the FERC's regulations, and FERC's Certificate Order by: (a) intentionally including diesel fuel and other toxic substances and unapproved additives in the drilling mud during its HDD operations under the Tuscarawas River in Stark County, Ohio; (b) failing to adequately monitor the right-of-way at the site of the Tuscarawas River HDD operation; and (c) improperly disposing of inadvertently released drilling mud that was contaminated with diesel fuel and hydraulic oil.

164.    The FERC proposed a massive $40 million civil penalty, which was "a departure" from the FERC's Penalty Guidelines. The FERC justified the enormous fine because of aggravating factors such as the serious environmental harm caused by the violation, the "ineffective and superficial" compliance program implemented, the severe lack of self-reporting of the incident, and the "obstructionist conduct" of Energy Transfer during the investigation.

165.    The FERC Order states, in relevant part:

> Contemporaneous evidence demonstrates that these violations were the product of a corporate culture – one that equally infected the executives managing the Tuscarawas River HDD and the onsite HDD crew – that favored speed and construction progress over regulatory compliance. This culture was fueled by Rover's execution of a $1.5 billion "time is of the essence" contract with a prime construction contractor – which constituted 35% of Rover's initial cost estimate for the Project. It was also fueled by Rover's self-imposed four-month schedule to complete over 500 miles of the pipeline construction. In addition to the contract

requirements, Rover's Executive Vice President of Engineering and Construction, Yousif (Joey) Mahmoud, continually applied direct pressure on the Vice President of its prime contractor, Bobby Poteete, to speed up construction, which funneled down to its subcontractor and HDD crews onsite.

Ex. A, Appendix A at 5.

166.    The FERC Order further disclosed that while Rover's document production was purportedly complete in March 2018 (*id.* at 30), on May 21, 2018 Rover produced more than 4,000 documents that were previously withheld or redacted, and that were not included in their privilege claims. *Id.* During the course of its investigation, the FERC's Enforcement Staff reviewed more than 25,000 documents produced by Rover and third parties, and took the testimony of 24 witnesses. *Id.* at 30-31.

167.    On this news, the price of Energy Transfer units declined 2.8% over the course of two trading days, to close at $8.25 per share on December 20, 2021, causing investors to lose more than $730 million in shareholder wealth.

## V.    CLASS ACTION ALLEGATIONS

168.    Lead Plaintiffs bring this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on their own behalf and as representatives of a Class, consisting of all those who purchased or otherwise acquired Energy Transfer units during the Class Period and were damaged upon the revelation of the alleged corrective disclosures ("Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Partnership, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

169.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, Energy Transfer units were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can

be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the Partnership's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

170.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class. Lead Plaintiffs and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

171.    Lead Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. Lead Plaintiffs are adequate representatives of the Class and have no interests that are adverse to the interests of absent Class members. Lead Plaintiffs have retained counsel competent and experienced in class action litigation.

172.    Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

(a)    whether statements made by Energy Transfer and the Individual Defendants to investors during the Class Period included the misrepresentation or omission of material facts;

(b)    whether Energy Transfer and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

(c)    whether Energy Transfer's and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- 60 -

(d)    whether the prices of Energy Transfer units during the Class Period were impacted by Energy Transfer's and the Individual Defendants' conduct described herein;

(e)    the injury suffered by Lead Plaintiffs and Class members; and

(f)    the appropriate measure of damages sustained by Lead Plaintiffs and Class members.

173.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

174.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Energy Transfer and the Individual Defendants.

175.    Lead Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VI.    APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE

176.    The market for Energy Transfer units was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Energy Transfer units traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and other members of the Class purchased or otherwise acquired Energy Transfer units

relying upon the integrity of the market price of Energy Transfer units and market information relating to Energy Transfer and have been damaged thereby.

177.    During the Class Period, the artificial inflation of the price of Energy Transfer units was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Energy Transfer's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Energy Transfer's financials and its business, operations, and prospects, thus causing the price of Energy Transfer units to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Energy Transfer units.  Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing Energy Transfer units at such artificially inflated prices, and each of them has been damaged as a result.

178.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the- market doctrine as:

(a)    Energy Transfer and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    these misrepresentations and omissions were material to Lead Plaintiffs and the Class;

(c)    Energy Transfer units were traded on the NYSE and were covered by numerous analysts;

(d)     Energy Transfer units were liquid and traded with significant volume during the Class Period;

(e)     the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Energy Transfer units; and

(f)     Lead Plaintiffs and Class members purchased and/or sold Energy Transfer units between the time Energy Transfer and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

179.    As a result of the foregoing, the market for Energy Transfer units promptly digested current information regarding Energy Transfer from all publicly available sources and reflected such information in Energy Transfer's share price.  Under these circumstances, all purchasers of Energy Transfer units during the Class Period suffered similar injury through their purchase of Energy Transfer units at artificially inflated prices.  Thus, a presumption of reliance applies.

180.    Accordingly, Lead Plaintiffs and Class members are entitled to a presumption of reliance upon the integrity of the market.

181.    In the alternative, Lead Plaintiffs and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Defendants omitted material information during the Class Period, violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the Partnership's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given

the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VII.    LOSS CAUSATION

182.    During the Class Period, as detailed *supra*, §IV.B, Defendants made false and misleading statements by misrepresenting the severity of the April 2017 Environmental Disaster and the ensuing delays and increased costs for the Rover Project.  Defendants' course of conduct artificially inflated, or artificially maintained, the price of Energy Transfer units and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired Energy Transfer units during the Class Period.

183.    The material misstatements and omissions regarding the Rover Project concealed the serious nature of the April 2017 Environmental Disaster and the resulting delays and increased costs for the Rover Project, and it was foreseeable that the value of Energy Transfer units would be adversely affected when the market learned that the Rover Project would not be completed by the stated deadlines and would be significantly over budget because of the material delays.

184.    The Class Period inflation in the price of Energy Transfer units was removed when information concealed by Defendants' false or misleading statements was revealed to the market. The information was disseminated through several partial disclosures that slowly revealed the nature and extent of construction delays and increased costs for the Rover Project.  These disclosures, as more particularly described at ¶¶99-101, 113-115, 123-124, 126, 144-146, 149, 151-154, 159, 163-166, removed artificial inflation from the price of Energy Transfer units, causing economic injury to Lead Plaintiffs and other members of the Class.

185.    The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued false and misleading statements that the Rover Project would meet updated deadlines set for the near future and Defendants' omissions

regarding the updated costs for the Rover Project as a result of the delays. Defendants' continued misrepresentations maintained the price of Energy Transfer units at a level that was inflated by fraud, inducing members of the Class to continue purchasing Energy Transfer units even after Defendants' partial disclosures.

186.    None of the partial disclosures were sufficient on their own to fully remove the inflation from the price of Energy Transfer units, because each only partially revealed the extent of the delays and increased costs associated with the Rover Project that had been concealed from investors.

187.    The decline in the price of Energy Transfer units was a foreseeable and direct result of the nature and extent of Defendants' materially false and misleading statements and omissions. Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and the Class.

188.    The declines in the price of Energy Transfer units, alleged in ¶¶107, 118, 131, 148, 156, 161, 167, are not necessarily comprehensive since fact and expert discovery are not complete. These declines in the price of Energy Transfer units were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors.

## VIII.  NO SAFE HARBOR

189.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly

forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Energy Transfer and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Energy Transfer who knew that those statements were false and misleading when made.

## IX.    CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act
### Against All Defendants

190.    Lead Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

191.    During the Class Period, Energy Transfer and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

192.    Energy Transfer and the Individual Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by: (a) making false statements of material facts or omitting to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with purchases of Energy Transfer units during the Class Period.

193.    Energy Transfer and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Energy Transfer were materially false and misleading;

knew that these statements would be disseminated to investors; and knowingly and substantially participated or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws. Energy Transfer and the Individual Defendants, through receipt of information reflecting true facts about Energy Transfer, their control over, and/or receipt of or modification to Energy Transfer's allegedly materially misleading statements, which made them aware of Energy Transfer's confidential proprietary information, participated in the fraudulent scheme complained of herein.

194.    The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Energy Transfer, and intended to deceive Lead Plaintiffs and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Energy Transfer employees to investors, including Lead Plaintiffs and Class members. These misrepresentations and omissions were material. A reasonable investor would consider the facts – such as the improbable construction timelines, the severity of the April 2017 Environmental Disaster incident, and the scope and progress of the formal investigation by the FERC – important in deciding whether to buy Energy Transfer units and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material facts.

195.    Pursuant to the foregoing, the price of Energy Transfer units was artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by Energy Transfer and the Individual Defendants, Lead Plaintiffs and Class members relied on the statements made by Energy Transfer and the Individual Defendants and/or the integrity of the market price of Energy Transfer units during the Class Period in purchasing Energy Transfer units at prices

- 67 -

that were artificially inflated due to false and misleading statements made by Energy Transfer and the Individual Defendants.

196.    Were Lead Plaintiffs and Class members made aware that the market price of Energy Transfer units was artificially and falsely inflated by misleading statements made by Energy Transfer and the Individual Defendants, and by material adverse information that Energy Transfer and the Individual Defendants failed to disclose, they would not have purchased Energy Transfer units at artificially inflated prices, or purchased them at any price.

197.    Based on the wrongful conduct alleged herein, Lead Plaintiffs and Class members have sustained damages in an amount to be determined at trial.

198.    Energy Transfer and the Individual Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiffs and Class members for significant damages sustained via their purchases of Energy Transfer units during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

199.    Lead Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

200.    During the Class Period, the Individual Defendants were involved in the management and operation of Energy Transfer's business affairs.  Due to their senior positions, they had knowledge of adverse non-public information regarding Energy Transfer's business model, strategy, valuation, and revenue targets and goals and false representations in connection therewith.

201.    As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Energy Transfer's financial

- 68 -

condition and results of operations, and to correct any public statements issued by Energy Transfer which were materially false or misleading.

202.    Due to their positions of authority at Energy Transfer, the Individual Defendants controlled the contents of various public filings, press releases, and reports which Energy Transfer disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause Energy Transfer to execute the wrongful acts alleged herein.  The Individual Defendants were therefore "controlling persons" at Energy Transfer pursuant to §20(a) of the Exchange Act.  On this basis, they were participants in the unlawful conduct alleged which caused the prices of Energy Transfer units to be artificially inflated.

203.    Based on the conduct described above, the Individual Defendants are liable for the violations committed by Energy Transfer pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs respectfully demand relief as follows:

A.      Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel;

B.      Awarding damages in favor of Lead Plaintiffs and members of the Class against Energy Transfer and the Individual Defendants, jointly and severally, for all damages sustained as a result of Energy Transfer's wrongdoing, in an amount to be proven at trial;

C.      Awarding Lead Plaintiffs and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.      Awarding Lead Plaintiffs and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.      Directing such further relief as it may deem just and proper.

- 69 -

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiffs demand a jury

trial as to all issues triable by a jury.

DATED:  September 30, 2022

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN (admitted *pro hac vice*)
HEATHER G. GEIGER (admitted *pro hac vice*)


*/s/ Debra J. Wyman*
DEBRA J. WYMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
hgeiger@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT ROTHMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

OFFICE OF THE NEW MEXICO
  ATTORNEY GENERAL
HECTOR BALDERAS, Attorney General,
BRIAN McMATH Assistant Attorney General
Post Office Drawer 1508
Santa Fe, NM  87504-1508
Telephone: 505/717-3500
bmcmath@nmag.gov

*Additional Counsel for Lead Plaintiffs*